[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 07-15004

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
MAY 11, 2010
JOHN LEY
CLERK

D. C. Docket No. 01-01275-CV-J-25-HTS

AMERICAN ASSOCIATION OF PEOPLE
WITH DISABILITIES,
on behalf of themselves and others
similarly situated,
DANIEL W. O'CONNOR,
KENT BELL,
on behalf of themselves and others similarly
situated,
BETH BOWEN,
on behalf of herself and others similarly
situated,

Plaintiffs-Appellees,

versus

KATHERINE HARRIS,
as Secretary of State for the State
of Florida, et al.,

Defendants,

JERRY HOLLAND,
as Supervisor of Elections in
Duval County, Florida,

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

(May 11, 2010)

Before TJOFLAT and CARNES, Circuit Judges, and HOOD, District Judge.[*]

TJOFLAT, Circuit Judge:

This case is before this court for the third time. In the first appeal, which challenged an injunction entered to enforce a federal regulation against one of the defendants, a panel of this court, while retaining jurisdiction, remanded the case with the instruction that the district court resolve two questions of fact. The district court did as instructed, and the case was returned to the panel. The panel then found that the injunction was premature and dismissed the appeal as moot. After the panel's mandate issued, the defendant moved the district court to vacate the injunction and dismiss the case. The court denied his motion and entered a final judgment, effectively reinstating the injunction. This appeal is from that judgment.

We conclude that because the federal regulation at issue is not subject to enforcement via the injunction the district court fashioned, the plaintiffs had no

_____

[*] Honorable Joseph M. Hood, United States District Judge for the Eastern District of Kentucky, sitting by designation.

legally cognizable claim for relief.  We therefore vacate the district court's judgment and remand the case with the instruction that the district court vacate the injunction and dismiss the action.

I.

Plaintiffs are visually or manually impaired Florida citizens who are registered to vote in Duval County, Florida, and are represented by the American Association of People with Disabilities (collectively "Plaintiffs").  Plaintiffs filed a putative class action on November 8, 2001,[1] against Katherine Harris, Florida Secretary of State; L. Clayton Roberts, Director of the Division of Elections of the Florida Department of State; John Stafford, the Supervisor of Elections of Duval County; and members of the Jacksonville City Council (collectively "Defendants"),[2] alleging that Defendants violated federal statutory and state constitutional provisions by failing to provide handicapped-accessible voting machines to visually or manually impaired Florida voters after the 2000 general

---

[1] The case was filed in the Jacksonville Division of the U.S. District Court for the Middle District of Florida and assigned to the Honorable Ralph W. Nimmons, Jr.  Judge Nimmons handled the case until shortly before his death on November 24, 2003.  The case was then reassigned to the Honorable Wayne E. Alley of the Western District of Oklahoma, who handled it until September 2, 2004.  On September 14, 2004, the case was reassigned to the Honorable Henry L. Adams, Jr., and he has presided over the case since that date.

[2] The geographic limits of the City of Jacksonville and Duval County are coextensive.  The City and the County are consolidated and are governed under the Charter of the Consolidated Government of the City of Jacksonville, which established a mayor-city council form of government.  Throughout this opinion, we refer to the City and the County interchangeably.

election.[3]  Specifically, Duval County implemented optical scan technology[4] to avoid "hanging chads" and other problems associated with the punch card system used in 2000, but purchased only three accessible touch screen machines with audio components for the entire County's use.[5]

Plaintiffs alleged that due to the lack of handicapped-accessible equipment, they could not enjoy the direct and secret voting experience enjoyed by non-disabled citizens, which violated their fundamental right to vote.  Their complaint stated claims under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12133, the Rehabilitation Act, 29 U.S.C. § 794, and provisions of the Florida Constitution and statutes.[6]  Plaintiffs requested a declaration that Defendants' conduct violated those laws, as well as an injunction prohibiting Defendants from

---

[3]  Jerry Holland succeeded John Stafford as Supervisor of Elections in Duval County, and Glenda E. Hood and Edward C. Kast succeeded Katherine Harris and L. Clayton Roberts, respectively. The district court dismissed the City Council members and the state officials from the case in orders entered on October 16, 2002, and September 20, 2007, respectively.  Those dismissals are not challenged here.  Although Jerry Holland is the sole defendant remaining in the case, for brevity we refer to him and the others who were sued collectively as "Defendants."

[4]  An optical scan system provides voters with a paper ballot that features ovals next to each candidate's name or ballot issue.  The voter uses a pen to fill in the oval corresponding to his or her vote.  Election officials then feed the ballot through a machine that uses a light beam to record which oval the voter selected and tabulates the total number of votes.

[5]  After the 2000 general election, Florida enacted legislation prohibiting the use of punch card systems effective September 2, 2002.  Fla. Stat. § 101.56042.

[6]  The complaint invoked the district court's federal question jurisdiction, 28 U.S.C. § 1331, with respect to the ADA and Rehabilitation Act claims, and the court's supplemental jurisdiction, 28 U.S.C. § 1367, with respect to the state law claims.

continuing their allegedly illegal activities and from purchasing more inaccessible voting machines.

Defendants moved to dismiss the complaint under Federal Rule of Civil Procedure 12(b)(6), arguing they had no duties under the ADA, Rehabilitation Act, or the Florida Constitution and Florida statutes to ensure that voting systems met the requirements of all disabled voters, or to provide absolute secrecy in voting. After briefing and oral argument, on October 16, 2002, the district court granted Defendants' motion to dismiss Plaintiffs' claims under the ADA, the Rehabilitation Act, and the Florida Constitution and statutes. The court held that Florida law, which enabled handicapped voters to have a third party assist them in the voting booth, satisfied the ADA and the Rehabilitation Act and Florida's constitutional and statutory requirements.[7]

The district court gave Plaintiffs leave to file an amended complaint including further allegations supporting their ADA and Rehabilitation Act claims, and directed them to consider whether the Florida election law, as amended by the 2002 Florida legislature, satisfied the requirements of those federal statutes.[8]

---

[7] The district court's Florida law holding is ambiguous. We interpret the court's holding as stated in the text preceding this footnote because it provides the only basis on which the court could have found no violation of the ADA or the Rehabilitation Act.

[8] The 2002 amendments of the Florida election law were enacted before the district court entered its October 16, 2002 order, but were not before the court at the time Defendants' motion to dismiss was argued and the court took the case under submission. Rather, the amendments

5

Plaintiffs filed a two-count amended complaint on November 5, 2002, alleging violations of the ADA and the Rehabilitation Act. The amended complaint noted that the 2002 Florida legislature had enacted H.B. 1350, mandating that each precinct in Florida provide one handicapped-accessible voting machine, but asserted that H.B. 1350, when implemented, would not satisfy the ADA and Rehabilitation Act requirements. Moreover, H.B. 1350 would not become effective until one year after the Florida legislature appropriated funding, and until that occurred, Duval County would not be mandated by Florida law to provide a handicapped-accessible voting machine at each precinct.

The amended complaint also noted federal legislation that had become effective one week before its filing date. On October 29, 2002, President Bush signed into law the Help America Vote Act of 2002 ("HAVA"), Pub. L. No. 107-252, 116 Stat. 1666 (codified at 42 U.S.C. §§ 15301–15545). In its Title III, HAVA required voting equipment used in federal elections to "be accessible for individuals with disabilities . . . in a manner that provides the same opportunity for access and participation (including privacy and independence) as for other voters" by demanding "at least one direct recording electronic voting system or other voting system equipped for individuals with disabilities at each polling place." 42

were brought to the court's attention shortly before the order issued.

U.S.C. § 15481(a)(3). State and local voting authorities had to comply with the accessibility provision by January 1, 2006. Id. § 15481(d). HAVA provided funding for states to make improvements required by § 15481. Id. § 15301.

The Florida legislature had enacted similar laws governing accessibility in polling places, which the amended complaint omitted to mention. Responding to the report of a Select Task Force on Voting Accessibility, which the Secretary of State had created following the 2000 general election to address problems with disabled voter accessibility, the 2002 Florida legislature had promulgated standards for voting equipment—including standards designed to solve the accessibility problem. The Department of State would certify equipment that met such statutory standards. Fla. Stat. § 101.56062; see also Electronic Voting Systems Act, 2002 Fla. Sess. Law Serv. 2002-17 (West) (codified at Fla. Stat. §§ 101.5601–.5614). Among other features, voting systems would be required to include a tactile or audio input device (or both), a method by which voters could confirm tactile or audio inputs, operable controls discernible by the visually impaired, and specific functions for audio ballots. Fla. Stat. § 101.56062. As with H.B. 1350, county compliance with § 101.56062 was required one year after the Florida legislature appropriated funding. 2002 Fla. Sess. Law Serv. 2002-218 § 22 (West).

The district court convened a bench trial on Plaintiffs' ADA and

7

Rehabilitation Act claims on September 23, 2003. By this time, the district court had dismissed the City Council members from the case; the County's Supervisor of Elections, the Secretary of State, and the State Department's Director of the Division of Elections remained. Their defense to Plaintiffs' claims was that the handicapped-accessible voting machines provided by the Florida legislature would satisfy HAVA Title III—and therefore the ADA and the Rehabilitation Act to the extent that Plaintiffs were contending that the latter two statutes applied to handicapped-accessible voting machines—and that appropriate steps were being taken in Duval County to meet HAVA Title III's requirements.

The trial ended on October 1, 2003, and, on March 26, 2004, the district court issued a declaratory judgment and an injunction against the County's Supervisor of Elections.[9] The court bypassed the questions of whether the Florida election law, as amended, passed ADA and Rehabilitation Act muster[10] but found

---

[9] Judge Alley presided over the trial and issued the declaratory judgment and injunction. See supra note 1. The district court dismissed the Secretary of State and the State Department's Director of the Division of Elections from the case in the judgment entered on September 20, 2007, which reflected the court's March 24, 2004 order stating that the state officials would be entitled to judgment against Plaintiffs upon submission of a final status report regarding the application of Diebold Elections Systems, Inc. for certification of its handicapped-accessible voting machines. From this point forward, we refer to the March 26, 2004 judgment, which relied on the reasoning of the district court's March 24, 2004 order.

[10] Nor did the district court address the question of whether HAVA Title III superseded the ADA and the Rehabilitation Act to the extent that Plaintiffs were attempting to apply those two statutes to the handicapped-accessible voting machine issues at hand. Rather, as indicated in the text infra, the court focused solely on Duval County's implementation of the provisions the Florida legislature had promulgated to solve the handicapped voter accessibility problem.

that the Supervisor of Elections, then John Stafford, had failed to satisfy the requirements of a regulation promulgated under the ADA, 28 C.F.R. § 35.151(b), which deals with "Nondiscrimination on the Basis of Disability in State and Local Government Services."[11]  Based on this violation, the court enjoined Stafford to provide, by April 12, 2004, at least one handicapped-accessible voting machine at twenty percent of the polling places in Duval County and to install, by May 14, 2004, an unspecified number of touch screen voting machines with audio capacity, as certified by the Department of State.[12]  Am. Ass'n of People with Disabilities v. Hood, 310 F. Supp. 2d 1226 (M.D. Fla. 2004).

On March 31, 2004, Stafford appealed the March 26 injunction to this court, asserting that the case was moot because HAVA Title III superseded the ADA and

_____

[11]  This regulation provides:

> Each facility or part of a facility altered by, on behalf of, or for the use of a public entity in a manner that affects or could affect the usability of the facility or part of the facility shall, to the maximum extent feasible, be altered in such manner that the altered portion of the facility is readily accessible to and usable by individuals with disabilities, if the alteration was commenced after January 26, 1992.

28 C.F.R. § 35.151(b).

[12]  Under Florida law, counties were, and still are, responsible for choosing the types of voting machines used in their precincts.  Any machines a county purchased had to be manufactured by a vendor approved by the Director of the Division of Elections and certified by the Director.  Fla. Stat. § 101.294.  Prior to the issuance of the district court's March 26 judgment, Diebold Election Systems, Inc. applied to the Division of Elections for certification of its accessible touch screen voting machine, and the district court instructed the Secretary of State and the Director of the Division to submit a report detailing Diebold's application and disclosing the results of the tests performed on the machine by handicapped testers.  See supra note 9.  The report was submitted, and the district court dismissed these defendants from the case.

9

the Rehabilitation Act (as they might apply in the handicapped-accessible voting machine context). Stafford further asserted that he was in the process of implementing the provisions of Florida law[13] and, under Title III, had until January 1, 2006 to complete the job. The district court's injunction was therefore premature.

While Stafford's appeal was pending, the following events took place. The Director of the Division of Elections certified the touch screen system manufactured by Diebold Election Systems, Inc. for use in Florida. The Florida legislature, in its 2004–2005 General Appropriations Act, appropriated $11,600,000 to the counties to comply with HAVA Title III and Florida law on voting accessibility. The appropriation triggered the deadline for at least one Title III-compliant voting machine to be available in each precinct by July 1, 2005. In April 2005, the City of Jacksonville enacted an ordinance appropriating a $1,187,543.79 grant from the state to purchase at least one accessible voting machine for each precinct. On July 29, 2005, the City and Diebold entered into a purchase agreement for Diebold's touch screen machines.

Given this information, on August 8, 2005, this court, while retaining jurisdiction over the appeal, remanded the case to the district court to answer two

---

[13] Stafford was referring to the Florida legislation that addressed the handicapped-accessibility problem—legislation the district court approved in its March 26, 2004 judgment.

questions of fact: (1) whether the City had a contract to provide Duval County with enough disabled-compliant voting machines to place one machine in each voting precinct, and (2) if a contract existed, whether the voting machines would be in place and ready for use by the next election. The district court held an evidentiary hearing and answered both questions in the affirmative.

Based on the district court's answers and Stafford's representation that the City had acquired 326 HAVA-compliant Diebold touch screen machines that would be ready for use as of November 17, 2005, this court concluded that Stafford's appeal was moot and, on August 17, 2007, entered an order dismissing it.[14]

On September 18, 2007, the district court, acting on its own initiative, ordered the Clerk of the District Court to enter a final judgment against Stafford in conformance with the court's March 26, 2004 declaratory judgment and injunction,[15] and the Clerk did so on September 20, 2007.[16] On October 4, 2007, Stafford moved the district court to vacate the September 20 judgment and to

_____

[14] That the Diebold machines would be ready for use by November 17, 2005, meant that Stafford had complied with HAVA Title III's January 1, 2006 deadline.

[15] In the same September 18, 2007 order, the court denied Plaintiffs' motion for attorney's fees and costs because a final judgment had not been entered, but gave Plaintiffs leave to refile a motion for attorney's fees and costs within fourteen days after entry of the September 18 order.

[16] Judge Adams was the district judge who issued the September 18, 2007 order because the case had been reassigned to him. See supra note 1.

11

dismiss the case with prejudice.[17]  On December 3, 2007, the district court entered an order denying his motion.  The next day, Stafford appealed the district court's September 20 judgment and the December 3 order.[18]

Stafford presents two arguments for the reversal of the September 20 judgment.  The first argument is that our dismissal of the previous appeal as moot required the district court to vacate its March 26, 2004 declaratory judgment and injunction and to dismiss the case.  The second is that the ADA's implementing regulation, 28 C.F.R. § 35.151(b), did not provide the district court with a legal basis for issuing the injunction, which obligated him to purchase voting machines that were accessible to the visually and manually impaired.  We are persuaded by Stafford's second argument; § 35.151(b) did not provide a private right of action that Plaintiffs could pursue here.  Having reached this holding, which will operate to terminate this controversy, we need not address Stafford's first argument.

II.

We begin our discussion of Stafford's second argument by noting that although Plaintiffs' amended complaint stated claims under the ADA and the Rehabilitation Act, and the parties tried those claims to the district court, the

---

[17]  Stafford moved the district court pursuant to Fed. R. Civ. P. 59(e).

[18]  We have jurisdiction because the district court entered a final judgment as to the relief requested in Plaintiffs' amended complaint.  28 U.S.C. § 1291.  Pending before the district court, and therefore not before us, are Plaintiffs' motions for attorney's fees and costs.

district court's March 26, 2004 declaratory judgment did not hold that Stafford (or any of the Defendants) had violated either of those two statutes. In fact, the district court reached no legal holding vis-à-vis the ADA or the Rehabilitation Act. Instead, the court found that Stafford had violated one of the ADA's implementing regulations, 28 C.F.R. § 35.151(b). Hood, 310 F. Supp. 2d at 1236. Specifically, the court concluded that by purchasing optical scan machines when it was technologically and financially feasible to purchase handicapped-accessible touch screen machines,[19] Stafford failed to fulfill his obligation to provide "to the maximum extent feasible" an altered portion of a facility that was "readily accessible and usable by individuals with disabilities." 28 C.F.R. § 35.151(b). The court relied on the expansive definition of "facility" in 28 C.F.R. § 35.104 to hold that voting equipment constituted a facility that, when altered, obligated the public entity operating it to make it accessible. Notably, however, the court did not find that this shortcoming violated the ADA or the Rehabilitation Act.

It is unclear where the district court found the authority to order Stafford to comply with 28 C.F.R. § 35.151(b) without first ascertaining whether the ADA itself authorized such relief. Although Plaintiffs referred to ADA implementing

---

[19] Recall that in his October 16, 2002 order, Judge Nimmons held that such purchase of optical scan machines did not violate the ADA because Florida law provided for third-party assistance in the voting booth.

regulations in their amended complaint and trial brief, they did so as part of their claim that Stafford was excluding them from participating in a program of voting, in violation of the ADA.  See Shotz v. Cates, 256 F.3d 1077, 1079 (11th Cir. 2001) (holding that to prove a violation of Title II of the ADA, a plaintiff must show, inter alia, "that he was 'excluded from participation in or . . . denied the benefits of the services, programs, or activities of a public entity' or otherwise 'discriminated [against] by such entity'" (quoting 42 U.S.C. § 12132)).  There is no indication in the amended complaint that Plaintiffs were alleging a violation of § 35.151(b) as a freestanding cause of action.  Indeed, Plaintiffs' trial brief did not even cite § 35.151(b).  Instead, it cited 28 C.F.R. § 35.149,[20] alleging that Stafford excluded them from a program of voting.

Precedent of the Supreme Court and the federal courts of appeals, including this court, certainly lends no support to the district court's holding that an administrative regulation automatically creates a private right of action.  In Cort v.

---

[20]  This regulation reads:

> Except as otherwise provided in § 35.150, no qualified individual with a disability shall, because a public entity's facilities are inaccessible to or unusable by individuals with disabilities, be excluded from participation in, or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any public entity.

28 C.F.R. § 35.149.

14

Ash, to determine whether Congress intended to create a private right of action where none was expressed in a statute, the Supreme Court looked for the answer to four questions:

> First, is the plaintiff one of the class for whose especial benefit the statute was enacted—that is, does the statute create a federal right in favor of the plaintiff? Second, is there any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one? Third, is it consistent with the underlying purposes of the legislative scheme to imply such a remedy for the plaintiff? And finally, is the cause of action one traditionally relegated to state law, in an area basically the concern of the States, so that it would be inappropriate to infer a cause of action based solely on federal law?

422 U.S. 66, 78, 95 S. Ct. 2080, 2088 (1975) (citations and quotations omitted). In later decisions, the Court focused on the second question —legislative intent—almost to the exclusion of the others. See, e.g., Thompson v. Thompson, 484 U.S. 174, 179, 108 S. Ct. 513, 516 (1988) ("The intent of Congress remains the ultimate issue . . . ."); Touche Ross & Co. v. Redington, 442 U.S. 560, 575, 99 S. Ct. 2479, 2489 (1979) ("The central inquiry [is] whether Congress intended to create, either expressly or by implication, a private cause of action."); Love v. Delta Air Lines, 310 F.3d 1347, 1351–52 & n.2 (11th Cir. 2002) (recognizing this trend and citing additional cases). Therefore, for an ADA implementing regulation to provide a private right of action, Congress must have unambiguously indicated in the enabling statute, expressly or by clear implication, its intent to provide a

15

remedy to injured parties, be it monetary, declaratory, or injunctive.

In Alexander v. Sandoval, 532 U.S. 275, 121 S. Ct. 1511 (2001), the Supreme Court squarely addressed whether a private right of action existed to enforce an administrative regulation. Section 601 of Title VI of the Civil Rights Act of 1964 contained a provision prohibiting discrimination in covered programs or activities on the basis of race, color, or national origin. 42 U.S.C. § 2000d. Section 602 of Title VI authorized federal agencies to effectuate § 601 by promulgating regulations. 42 U.S.C. § 2000d-1. One regulation promulgated under § 602 prohibited funding recipients from using criteria or "methods of administration" that had the effect of discriminating based on race, color, or national origin. 28 C.F.R. § 42.104(b)(2).

The plaintiffs, contending that § 42.104(b)(2) provided a private right of action, sued to enjoin the enforcement of an Alabama policy mandating that driver's license examinations be given only in English. The district court enjoined the enforcement, and this court affirmed. Sandoval v. Hagan, 197 F.3d 484, 511 (11th Cir. 1999). The Supreme Court, however, reversed. The Court noted first that it had previously interpreted § 601 to reach only intentional acts of discrimination, not disparate-impact discrimination, 532 U.S. at 280–81, 121 S. Ct. at 1516 (citing Guardians Ass'n v. Civil Serv. Comm'n of N.Y. City, 463 U.S. 582,

16

103 S. Ct. 3221 (1983)), and that it was "clear that the private right of action to enforce § 601 does not include a private right to enforce" the disparate-impact regulation, § 42.104(b)(2), id. at 285–86, 121 S. Ct. at 1519 (citing Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A., 511 U.S. 164, 173, 114 S. Ct. 1439, 1446 (1994)).  Instead, the right had to "come, if at all, from the independent force of § 602." Id. at 286, 121 S. Ct. at 1519.

Examining § 602, the Court found that it contained no "rights-creating" language akin to that which the Court had previously found in § 601.  Id. at 288 (citing Cannon v. Univ. of Chi., 441 U.S. 677, 690 n.13, 99 S. Ct. 1946, 1954 n.13 (1979) (finding "rights-creating" language in § 601)).  Furthermore, § 602 provided methods for its own enforcement (such as an agency's ability to terminate funding to a program that violated the regulation) that militated against congressional intent to create a private remedy.  Id. at 289–91, 121 S. Ct. at 1521–22.  The Court rejected the plaintiff's argument that the regulation contained rights-creating language that made it privately enforceable, because no such language appeared in § 602: "Language in a regulation may invoke a private right of action that Congress through statutory text created, but it may not create a right that Congress has not." Id. at 291, 121 S. Ct. at 1522.  Thus, because "it is most certainly incorrect to say that language in a regulation can conjure up a private

17

cause of action that has not been authorized by Congress," id., and because Title VI did not "display an intent to create a freestanding private right of action to enforce regulations promulgated under § 602," id. at 293, 121 S. Ct. at 1523, the Court held the plaintiffs had no stand-alone cause of action to enforce § 602's regulations, id.

Following Sandoval's reasoning, we recognized in Love that we must look to "legislative intent to create a private right of action as the touchstone of [the] analysis." 310 F.3d at 1352. We held further that "while regulations that merely interpret a statute may provide evidence of what private rights Congress intended to create . . . 'regulations that go beyond what the statute itself requires' are not enforceable through a private right of action." Id. at 1354 (quoting Sandoval, 532 U.S. at 293 n.8, 121 S. Ct. at 1523 n.8). We also held that if examination of the text and history of a statute does not allow us to conclude that Congress intended to create a private right of action, "Sandoval instructs that such a right may not be created or conferred by regulations promulgated to interpret and enforce it." Id. at 1353.

The lesson from Sandoval and the cases interpreting it, taken together with Cort's focus on legislative intent, is simple and straightforward. There is no freestanding private right of action to enforce a statute's implementing regulation

18

unless Congress has clearly indicated, expressly or impliedly, to the contrary. To find such a right of action, a court must examine the text, history, and structure of both the statute and the regulation to see if Congress provided both a right to enforce the regulation and a remedy for successful plaintiffs. See Sandoval, 532 U.S. at 288, 121 S. Ct. at 1520; Cort, 422 U.S. at 78, 95 S. Ct. at 2088.

In this case, to find a private right of action in § 35.151(b), the district court would have had to employ an analysis of the type employed by the Ninth Circuit in Lonberg v. City of Riverside, 571 F.3d 846 (9th Cir. 2009), petition for cert. filed, (U.S. Apr. 15, 2010) (No. 09-1259). There, the court applied Sandoval in deciding an ADA claim that a city had not met the standards for ADA compliance transition plans set forth in 28 C.F.R. § 35.150(d). The court summarized Sandoval as

> instruct[ing] that because only Congress can create a private right of action through statute, we must examine a challenged regulation in the context of the statute it is meant to implement. Only those regulations effectuating the statute's clear prohibitions or requirements are enforceable through the statute's private right of action; regulations that do not encapsulate the statutory right and corresponding remedy are not privately enforceable.

571 F.3d at 850–51. The court examined ADA Title II § 202, 42 U.S.C. § 12132 (prohibiting discrimination by public entities on the basis of disabilities),[21] and

---

[21] The statutory prohibition against discrimination in Title II of the ADA reads:

> Subject to the provisions of this subchapter, no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or

found that its language neither imposed upon public entities an obligation to draft a detailed compliance plan to achieve "meaningful access" for those with disabilities, nor indicated that enforcement of § 35.150(d) would necessarily remedy a "meaningful access" violation. 571 F.3d at 851. Accordingly, "under Sandoval, [§ 35.150(d)] is not enforceable through § 202's private right of action because the obligations it imposes are nowhere to be found in § 202's plain language." Id. at 852.

Here, the order supporting the district court's March 26, 2004 declaratory judgment and injunction is bereft of any such analysis. Furthermore, when we examine § 35.151(b) in a manner similar to the Ninth Circuit's examination in Lonberg, we find no congressional intent to create a private right of action for the regulation's enforcement. As the ADA's text indicates, Congress enacted the statute as a prophylactic measure to eradicate discrimination against persons with disabilities. 42 U.S.C. § 12101 (finding that "census data, national polls, and other studies have documented that people with disabilities, as a group, occupy an inferior status in our society, and are severely disadvantaged socially, vocationally, economically, and educationally" and stating that one of the ADA's purposes is "to

---

be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by such entity.

42 U.S.C. § 12132.

provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities"); see also Tennessee v. Lane, 541 U.S. 509, 531, 124 S. Ct. 1978, 1993 (2004) ("Faced with considerable evidence of the shortcomings of previous legislative responses [to disability discrimination], Congress was justified in concluding that this difficult and intractable proble[m] warranted added prophylactic measures in response." (quotations omitted; second alteration in original)).  As part of the statute's broad sweep, Congress intended to grant wide enforcement powers to ensure that the ADA's purposes would be effected.  42 U.S.C. § 12101(b) (including among the ADA's purposes "to provide clear, strong, consistent, enforceable standards addressing discrimination against individuals with disabilities" and "to invoke the sweep of congressional authority, including the power to enforce the fourteenth amendment and to regulate commerce").

While the ADA directed the Attorney General to promulgate regulations implementing Part II, 42 U.S.C. § 12134,[22] the purpose of those regulations is to

_____

[22]  This section provides:

> Not later than 1 year after July 26, 1990, the Attorney General shall promulgate regulations in an accessible format that implement this part.  Such regulations shall not include any matter within the scope of the authority of the Secretary of Transportation under section 12143, 12149, or 12164 of this title.

> . . . .

provide standards for compliance with the ADA, id. § 12134(c), not to give

individuals a right to sue if compliance with those standards is not met. Congress,

in fashioning an express statutory right of action in the ADA itself, 42 U.S.C. §

12133,[23] anticipated that violations would occur and provided a statutory

enforcement mechanism for aggrieved parties to seek a remedy. See Sandoval,

532 U.S. at 284, 121 S. Ct. at 1518 ("A Congress that intends the statute to be

enforced through a private cause of action intends the authoritative interpretation

of the statute to be so enforced as well."). Thus, Congress placed any available

recourse for plaintiffs alleging disability-based discrimination within the language

of the ADA. The regulations, by contrast, interpret and define the scope of the

ADA. They do not, themselves, create a private right of action and a remedy.

---

Regulations under subsection (a) of this section shall include standards applicable
to facilities and vehicles covered by this part, other than facilities, stations, rail
passenger cars, and vehicles covered by part B of this subchapter. Such standards
shall be consistent with the minimum guidelines and requirements issued by the
Architectural and Transportation Barriers Compliance Board in accordance with
section 12204(a) of this title.

42 U.S.C. § 12134(a), (c).

[23] This section provides:

The remedies, procedures, and rights set forth in section 794a of Title 29 shall be
the remedies, procedures, and rights this subchapter provides to any person
alleging discrimination on the basis of disability in violation of section 12132 of
this title.

42 U.S.C. § 12133.

The situation in this case resembles that in Sandoval and Lonberg, where a statute prohibits discrimination (here, 42 U.S.C. § 12132); implementing regulations exist pursuant to an authorizing section of the statute (42 U.S.C. § 12134); and a private right of action exists pursuant to still another section of the statute (42 U.S.C. § 12133). An individual's ability to sue lies in § 12133; as in Sandoval, it does not automatically lie in the regulations implemented under the statute's authority. This owes, moreover, to the focus on legislative intent made clear in the cases interpreting Cort v. Ash. Congress could have stated it that intended a private right of action under the ADA and, separately, under its implementing regulations—but Congress said no such thing. Finally, nothing in § 12133 indicates Congress's intent to provide a private right of action to redress violations of the ADA's regulations.[24] Rather, that section exists to grant a right of

_____

[24] We note that while two circuits have found 28 C.F.R. § 35.151 enforceable through the private right of action created in ADA Title II, 42 U.S.C. § 12133, those cases are distinguishable. In Ability Center of Greater Toledo v. City of Sandusky, 385 F.3d 901, 903–13 (6th Cir. 2004), the Sixth Circuit held that because § 35.151 "effectuates a mandate of Title II," it is enforceable through the ADA's private cause of action, 42 U.S.C. § 12133. 385 F.3d at 907. The district court here, however, made no mention of enforcing § 35.151(b) through the ADA; rather, it treated § 35.151(b) as creating a freestanding right to sue. Even Ability Center cannot be extended to support that proposition. See id. at 906 (heeding Sandoval's rule that "a private plaintiff cannot enforce a regulation through a private cause of action generally available under the controlling statute if the regulation imposes an obligation or prohibition that is not imposed generally by the controlling statute"). Because § 35.151's particular standards for new and altered construction do not appear in the general language of the ADA, Sandoval forecloses reliance on the ADA Title II cause of action to enforce the regulation. 532 U.S. at 291, 121 S. Ct. at 1522.

The Tenth Circuit's decision that § 35.151 is privately enforceable, Chaffin v. Kan. State Fair Bd., 348 F.3d 850, 858 (10th Cir. 2003), is dubious for at least two reasons. First, other

action to those alleging a violation of the ADA itself, by providing the remedies available under the Rehabilitation Act, 29 U.S.C. § 794a.[25]

Even if we were to assume that § 35.151(b) created a private right of action, it is puzzling why the district court applied it in the context of providing handicapped-accessible voting machines. Section 35.151, as its title implies, addresses physical access by the disabled to public buildings. In subsection (a), it sets reasonable architectural standards for public entities to follow when building new facilities; in subsection (b), it provides standards for altering existing ones. See Ass'n for Disabled Ams., Inc. v. Fla. Int'l Univ., 405 F.3d 954, 959 (11th Cir. 2005); Nondiscrimination on the Basis of Disability in State and Local Government Services, 56 Fed. Reg. 35,694, 35,710 (July 26, 1991) ("Section 35.151 provides that those buildings that are constructed or altered by, on behalf of, or for the use of a public entity shall be designed, constructed, or altered to be

_____

courts have noted that Chaffin gave short shrift to Sandoval's instruction that regulations imposing obligations beyond a statutory mandate are not enforceable through the statute's cause of action. Iverson v. City of Boston, 452 F.3d 94, 101–02 (1st Cir. 2006); Californians for Disability Rights, Inc. v. Cal. Dep't of Transp., 249 F.R.D. 334, 341–42 (N.D. Cal. 2008). Second, Chaffin applied Sandoval in a categorical manner to several ADA regulations, rather than examining each regulation individually to see if it evinced congressional intent to enforce the regulations through a private right of action, as Sandoval demands. Lonberg, 571 F.3d at 852. Both of these infirmities greatly diminish Chaffin's relevance to the instant case.

Hence, our conclusion that § 35.151(b) does not confer an independent cause of action is not swayed by our sister circuits' decisions in Ability Center or Chaffin.

[25] The Rehabilitation Act, in turn, relies on the remedies provided in Titles VI and VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000d, 2000e-16. See 29 U.S.C. § 794a.

24

readily accessible to and usable by individuals with disabilities if the construction was commenced after the effective date of this part."). The regulation preceding § 35.151 bolsters this conclusion by incorporating § 35.151 into its requirement that public entities operate services, programs, or activities such that they are readily accessible by individuals with disabilities: "A public entity, in making alterations to existing buildings, shall meet the accessibility requirements of § 35.151." 28 C.F.R. § 35.150(b)(1) (emphasis added).

By contrast, this case is not, and never has been, about visually and manually impaired voters' access to polling places themselves, i.e., fire stations, schools, churches, and other physical locations where Duval County precincts might place voting machines. From the beginning of this litigation, Plaintiffs attempted to (1) secure voting machines that provided greater accessibility to visually and manually impaired voters, and (2) secure more of those machines so they were available in as many Duval County polling places as possible. Plaintiffs never complained about the accessibility of polling locations themselves. This begs the question of why a regulation that addresses building standards for physical facilities would be relevant to Plaintiffs' allegations of inadequate, undersupplied voting machines.

Still more puzzling is why the district court applied § 35.151(b), which

25

concerns alterations to existing facilities, to impose an obligation on Stafford to supply handicapped-accessible voting machines. The district court stated, without further elaboration, that "[t]he standard for alterations, rather than new construction, is applicable in the instant case." But § 35.151(b), by its own language, does not become operative—and thereby impose legal obligations on anyone—unless and until an alteration has taken place. See 28 C.F.R. § 35.151(b) ("Each facility or part of a facility altered by, on behalf of, or for the use of a public entity . . . shall, to the maximum extent feasible, be altered in such manner that the altered portion of the facility is readily accessible to and usable by individuals with disabilities . . . ."). The subsection's language implies the common sense proposition that an alteration having occurred is a prerequisite to that alteration's being made accessible to the public.

New facilities constructed for use by public entities must be accessible, id. § 35.151(a); alterations of existing facilities must also be accessible, id. § 35.151(b). Nothing in this case has been altered, not voting machines or any other "facility" (assuming that a voting machine could be a facility). Instead, Stafford acquired 326 new, handicapped-accessible voting machines by November 17, 2005, in advance of the compliance date specified by HAVA. Were we to stretch the regulatory definition and treat the new voting machines as "new construction,"

under § 35.151(a) (and we do not adopt such a warped interpretation), Plaintiffs could have no complaint, since they admit that the new voting machines met federal and state standards for accessibility by visually and manually impaired voters. In sum, even if we read a private right of action into § 35.151 (which, again, we do not), Stafford would have had no obligation under either § 35.151(a) or § 35.151(b), the subsections cited by the district court, to do more than he did.

A final word is in order about why our decision on Plaintiffs' regulatory claim also dispenses with their ADA and Rehabilitation Act claims. Recall that the district court dismissed those claims on October 16, 2002, because it held that Florida law fulfilled those statutes' requirements. That order dismissing the statutory claims was incorporated into the court's September 20, 2007 final judgment, and Plaintiffs did not cross-appeal from that judgment. The statutory claims, therefore, were disposed of in the district court, and there is no need for us to issue a new ruling that they are moot.

## III.

For the foregoing reasons, Plaintiffs could not have had a private right of action under 28 C.F.R. § 35.151(b), and the district court erred by affording them one. We therefore VACATE its judgment of September 20, 2007 and REMAND the case to the district court with the instruction to vacate the injunction and enter a

27

final judgment dismissing this case with prejudice.[26]

        SO ORDERED.

---

[26] As indicated in note 18, <u>supra</u>, pending in the district court are Plaintiffs' motions for attorney's fees and costs. The ADA's attorney's fee provision, by its terms, requires a party to prevail in order to receive an attorney's fee award. 42 U.S.C. § 12205. Plaintiffs cannot recover their attorney's fees here on the ground that they prevailed, for they did not. Nor can they recover their attorney's fees for serving as a "catalyst," i.e., that they caused Stafford to implement the changes they sought. <u>Buckhannon Bd. & Care Home, Inc. v. W. Va. Dep't of Health & Human Res.</u>, 532 U.S. 598, 610, 121 S. Ct. 1835, 1843 (2001) (rejecting the "catalyst" theory), <u>superseded in part by statute</u>, OPEN Government Act of 2007, Pub. L. No. 110-175, 121 Stat. 2524 (2007) (codified at 5 U.S.C. § 552(a)(4)(E)) (amending the fee-shifting provision of the Freedom of Information Act but not the ADA); <u>Morillo-Cedron v. Dist. Dir. for the U.S. Citizenship & Immigration Serv.</u>, 452 F.3d 1254, 1257 (11th Cir. 2006). Accordingly, this case has ended.