Michele **HADDAD**, Plaintiff,

v.

Thomas **ARNOLD**, in his official capacity as Secretary, Florida Agency for Health Care Administration, and Dr. Anna Viamonte Ross, in her official capacity as Secretary, Florida Department of Health, Defendants.

Case No. 3:10–cv–414–J–99MMH–TEM.

United States District Court, M.D. Florida, Jacksonville Division.

July 9, 2010.

---

Jay M. Howanitz, Spohrer & Dodd, PL, Jacksonville, FL, Stephen F. Gold, Law Office of Stephen F. Gold, Philadelphia, PA, for Plaintiff.

Andrew T. Sheeran, Florida Agency for Health Care Administration, William Michael Blocker, II, Agency for Health Care Administration, Tallahassee, FL, for Defendants.

## OPINION

MARCIA MORALES HOWARD,
District Judge.

**THIS CAUSE** came before the Court on Plaintiff Michele Haddad's [1] Motion for Preliminary Injunction, Memorandum in Support Thereof, and Expedited Hearing (Doc. No. 2; Motion),[2] filed on May 13, 2010. Plaintiff is suing Defendants, under 42 U.S.C. § 12133 and 29 U.S.C. § 794(a), alleging that they are discriminating against her on the basis of her disability in violation of the Americans with Disabilities Act (the "ADA") and the Rehabilitation Act (the "Rehab Act"). *See* Complaint (Doc. No. 1) at 1, 11–13. In the Motion, Plaintiff requested that the Court enjoin Defendants from denying her Medicaid in-home services in order to prevent her from being forced into unnecessary institutionalization in a nursing home. *See* Motion at 1.

1. Plaintiff is also involved in the related case of *Jones v. Arnold*, 3:09–cv–1170–J–34JRK, as a member of a putative class sought to be certified. *See* May 7, 2010 Order (3:09–cv–1170–J–34JRK Doc. No. 62) at 1. She initially filed a motion for preliminary injunction in the *Jones* case, but the Court denied that motion without prejudice because, as an unnamed class member in an uncertified class, Plaintiff was not yet a party to the action and lacked standing to seek preliminary injunctive relief therein. *See id.* at 1–3. Subsequently, Plaintiff filed the present action and the instant motion in her own name.

2. Attached to the Motion are Plaintiff Michele Haddad's Declaration in Support of her Motion for a Preliminary Injunction (Doc. No. 2–1; Haddad Dec.), the Declaration of Jeffery S. Johns, M.D. (Doc. No. 2–2; Johns Dec.), and the Affidavit of Kristen Russell (Doc. No. 2–3; Russell Aff. I), which was originally filed in the related *Jones* case.

3. Attached to the Statement of Interest are the following: an additional copy of the Russell Affidavit I (Doc. No. 10–1 at 5); a letter

## I. PROCEDURAL HISTORY

Upon review of the Motion, the Court entered an order taking the Motion under advisement and directing Plaintiff to serve the Motion and supporting materials on Defendants. *See* May 13, 2010 Order (Doc. No. 4) at 1. While Plaintiff was complying with the Court's order, the United States filed a motion seeking leave to submit a brief in this action, *see* United States' Motion for Leave to Appear Specially (Doc. No. 6) at 1, and the Court granted that request, *see* May 21, 2010 Order at 1–2. As such, the United States filed its brief on May 24, 2010.[3] *See* Statement of Interest of the United States of America (Doc. No. 10; Statement of Interest).

Once Plaintiff accomplished service of process,[4] the Court entered another order scheduling a hearing on the Motion for June 7, 2010, and set an expedited briefing schedule due to the urgency of this matter.

dated February 23, 2010 (Doc. No. 10–1 at 7–9; February 23, 2010 Letter); Defendants' Response and Memorandum of Law in Opposition to Michele Haddad's Motion for Preliminary Injunction (Doc. No. 10–1 at 11–29), originally filed in the *Jones* case; Initial Brief from Holly Benson, in her Official Capacity as Secretary, Florida Agency for Health Care Administration, and Douglas Beach, in his Official Capacity as Secretary, Florida Department of Elder Affairs (Doc. No. 10–1 at 31–88; Benson Brief), from the Eleventh Circuit Court of Appeals action, *Benson v. Long*, Case No.: 08–16261 AA; January 25, 2010 Memorandum and Order Doc. No. 38 (Doc. No. 10–1 at 90–98; Benjamin Order), from the United States District Court for the Middle District of Pennsylvania action, *Benjamin v. Dep't of Pub. Welfare, Commonwealth of Pa.*, 09–cv–1182; and a copy of *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 119 S.Ct. 2176, 144 L.Ed.2d 540 (1999).

4. *See* Returns of Service (Doc. Nos. 11 and 12) filed May 25, 2010.

*See* May 25, 2010 Order (Doc. No. 13) at 1–2. In the May 25, 2010 Order, the Court directed Defendants to respond to the Motion by May 28, 2010, and permitted Plaintiff to submit a reply brief on or before June 2, 2010. *See id.* at 2–3. However, on May 27, 2010, Defendants filed an emergency motion requesting an extension of time in which to file their response. *See* Emergency Motion for Extension of Time (Doc. No 20; Emergency Motion) at 1–2. That same day, the Court held a telephonic hearing on the Emergency Motion. *See* May 27, 2010 Order (Doc. No. 21) at 1. During the hearing, Plaintiff's counsel advised that Plaintiff was, at that time, hospitalized due to medical complications unrelated to the alleged denial of services that are the subject of this action. Although counsel did not know when she would be medically able to be discharged, he indicated that Plaintiff was in limbo and would be unable to go home without the provision of the services at issue in the instant litigation. After hearing from the parties, the Court granted Defendants' requested extension and continued the hearing on the Motion until June 15, 2010. *See* Clerk's Minutes (Doc. No. 22) at 1. However, in light of Plaintiff's circumstances, the Court directed Plaintiff's counsel to immediately file a notice if Plaintiff was medically able to be released from the hospital, but not able to do so because of the unavailability of in-home health care services. In accordance with the Court's directives from the May 27, 2010 hearing, the parties timely filed their responsive memoranda, *see* Defendants' Response and Memorandum of Law in Opposition to Plaintiff's Motion for Preliminary Injunction (Doc. No. 27; Response); Plaintiff Michele Haddad's Response to Defendants' Memorandum in Opposition to the Preliminary Injunction (Doc. No. 29; Reply), which are supported by various documents.[5]

The Court held a hearing on the Motion on June 15, 2010. *See* Clerk's Min-

---

**5.** The Response is supported by the following: the Affidavit of Elizabeth Y. Kidder in Support of Defendant's [sic] Response and Memorandum of Law in Opposition to Motion for Preliminary Injunction (Doc. No. 24–1; Kidder Aff.); a draft copy of the Florida Nursing Home Transition Plan (Doc. No. 24–2; Transition Plan); a copy of the Settlement Agreement from *Long v. Benson,* 4:08cv26–RH/WCS in the United States District Court for the Northern District of Florida (Doc. No. 24–3; Long Settlement); the Affidavit of Kristen Russell in Support of Defendant's [sic] Response and Memorandum of Law in Opposition to Motion for Preliminary Injunction (Doc. No. 25–1; Russell Aff. II); the Affidavit of Susan Michele Hudson in Support of Defendant's [sic] Response and Memorandum of Law in Opposition to Motion for Preliminary Injunction (Doc. No. 26–1; Hudson Aff.); and another copy of the Russell Affidavit I (Doc. No. 27–1).

The Reply is accompanied by copies of the following: SSI–Related Programs Fact Sheets January 2010 (Doc. No. 29–1; Fact Sheets); Appendix C–Eligibility and Post–Eligibility Medicaid Eligibility Groups Served (Doc. No. 29–2; Medicaid Eligibility); Appendix B–4: Medicaid Eligibility Groups Served in the Waiver (Doc. No. 29–3; Waiver Eligibility); AARP Across the States Profiles of Long–Term Care and Independent Living (Doc. No. 29–4; AARP Profile); Florida Medicaid Nursing Homes January, 2010 Rate Semester Initial Per Diems (Doc. No. 29–5; Per Diem); a series of documents related to Defendants' October 2007 amendment of Florida's Home- and Community–Based Waiver for Individuals (aged 18 and older) with Traumatic Brain or Spinal Cord Injuries (Doc. No. 29–6; Waiver Amendment); Home and Community Based Service Waivers and Long Term Care (Doc. No. 29–7; Waiver List); Kaiser Commission on Medicaid and the Uninsured November 2009 (Doc. No. 29–8; Kaiser Report); Spinal Cord Injury in Florida, a Needs and Resources Assessment (Doc. No. 29–9; Assessment); and a letter dated January 8, 2010 (Doc. No. 29–10; January 8, 2010 Letter).

utes (Doc. No. 39; Preliminary Injunction Hearing). At the beginning of the hearing, Plaintiff's counsel advised that Plaintiff's medical condition was improving. Indeed, Plaintiff was able to leave the hospital for a period of time to attend a portion of the hearing in person. Her counsel also advised the Court that he had spoken to Plaintiff's social worker who indicated that Plaintiff was expected to be discharged from the hospital in two to three weeks. At the conclusion of the hearing, after again confirming that Plaintiff was expected to remain hospitalized for reasons unrelated to the allegations in this action for an additional period of two to three weeks, the Court requested additional briefing from the parties on one legal issue. The parties have filed those memoranda. *See* Plaintiff Michele Haddad's Memorandum in Response to the Court's Request Regarding Preliminary Injunction Standards (Doc. No. 41; Plaintiff's Memorandum); Defendants' Memorandum of Law on the Standard for Injunctive Relief (Doc. No. 43–1; Defendants' Memorandum); United States' Memorandum of Law Regarding the Preliminary Injunction Standard (Doc. No. 44; United States' Memorandum).

In addition to filing Plaintiff's Memorandum as directed on June 21, 2010, Plaintiff's counsel filed a notice indicating that he had "just received notice that Brooks Rehabilitation Hospital plans to discharge Michele Haddad on Thursday, June 24, 2010." *See* Notice of Status Regarding Michele Haddad (Doc. No. 40; Plaintiff's Notice of Status). By the time the Court reviewed Plaintiff's Notice of Status, having had the benefit of the parties' briefing and the arguments presented at the hearing, the Court had determined that preliminary injunctive relief was warranted and was in the process of preparing a written opinion and order which would grant Plaintiff relief and set forth the Court's reasons for doing so. However, upon review of Plaintiff's Notice of Status, the Court determined that the urgency of the circumstances required the issuance of an order resolving the Motion without a delay solely necessary to complete the preparation of a written opinion. Thus, the Court granted the Motion with the intention of providing an opinion setting forth its reasoning at a later date. *See* June 23, 2010 Order (Doc. No. 46) at 8. The Court fulfills that intention here.

## II. *FACTUAL BACKGROUND* [6]

Plaintiff is a forty-nine-year-old resident of Florida. *See* Haddad Dec. at 1. On September 7, 2007, when she was forty-seven, Plaintiff was in a motorcycle accident caused by an intoxicated driver. *See id.* As a result of the accident, Plaintiff is paralyzed from the chest down and has a diagnosis of quadriplegia, with a spinal injury at the c6–c7 vertebrae. *See* Johns Dec. at 3; *see also* Haddad Dec. at 2. Plaintiff is mentally alert and fully aware of her surroundings, but she has minimal manual dexterity. *See* Johns Dec. at 4; *see also* Haddad Dec. at 3. Her right hand

---

**6.** The Court notes that, as the Motion was one for preliminary injunctive relief and necessarily before the Court on an expedited schedule, the factual record contained herein may not be completely developed. Therefore, the following facts and conclusions of law do not necessarily reflect what may be established on a record more fully developed following trial on these issues. Accordingly, the determinations in this Order are expressly limited to the record before the Court at the time of the Preliminary Injunction Hearing and do not indicate or limit the ultimate outcome of the issues presented in this matter.

remains closed, and her left hand remains open. *See* Johns Dec. at 4; Haddad Dec. at 3. However, she has some limited ability to use her arms. *See* Johns Dec. at 4. After her accident, Plaintiff required a tracheotomy, which has been removed, but Plaintiff cannot speak and breathe at the same time. *See id.* Additionally, she is required to take various medications, and is at risk for injury and infection due to her catheterization. *See id.* Plaintiff uses a motorized wheelchair for mobility, and resides in a wheelchair-accessible home with a roll-in shower. *See id.*; Haddad Dec. at 2–3. Nevertheless, Plaintiff is completely dependent on others to help her perform most of her activities of daily living, including transferring from her bed to her wheelchair, dressing, bathing and showering, toileting, bladder management, assistance with bowel movements, including digital stimulation, and shopping for, preparing, and eating food. *See* Johns Dec. at 4; *see also* Haddad Dec. at 3. She requires ten to twelve hours a day of in-home assistance to remain in the community.[7] *See* Johns Dec. at 5.

Plaintiff's rehabilitation is ongoing, and she uses the out-patient equipment and facilities at Brooks Rehabilitation Hospital ("Brooks") in Jacksonville, Florida, where she was a patient from November 2007 to January 2008, after her accident. *See* Johns Dec. at 3–4. Despite her dependence on the care from others, Plaintiff has maintained an active life in the community. *See* Haddad Dec. at 4; *see also* Johns Dec. at 5. She attends church, goes to the movies, visits friends, goes shopping, and exercises at the Brooks gymnasium. *See* Haddad Dec. at 4; *see also* Johns Dec. at 5. At the telephonic hearing on May 27, 2010, Plaintiff's counsel represented that Plaintiff had experienced medical complications requiring another tracheotomy and had been hospitalized at Brooks where she would remain for an unknown length of time. On June 21, 2010, Plaintiff's counsel notified the Court that Plaintiff was scheduled to be discharged from Brooks on June 24, 2010. *See* Plaintiff's Notice of Status at 1.

After Plaintiff's initial discharge from Brooks in January 2008, her husband was her primary care giver. *See* Haddad Dec. at 3; *see also* Johns Dec. at 5. In November 2009, Plaintiff and her husband divorced, yet he continued to provide Plaintiff's care until he moved out of their home in March 2010. *See* Haddad Dec. at 3; Johns Dec. at 5. After that time, one of Plaintiff's adult sons, who was living in Miami, Florida and had recently graduated from college, temporarily moved back home in order to provide Plaintiff the care she needed to remain in the community. *See* Haddad Dec. at 3; Johns Dec. at 5. From that time until Plaintiff's hospitalization, her son became responsible for all of the tasks Plaintiff's husband had performed, including very personal care, such as hygiene and administering Plaintiff's bowel program. *See* Haddad Dec. at 3–4; *see also* Johns Dec. at 5. Plaintiff's son returned to care for Plaintiff because of her exigent circumstances, but would be

**7.** In the Complaint, which is not verified, Plaintiff asserts that she would require "about seven hours a day for all her activities of daily living." *See* Complaint at 5. However, Plaintiff's physician's declaration indicates that, in his medical opinion, Plaintiff "requires about 10–12 hours a day of in-home assistance in order to meet her needs." *See* Johns Dec. at 5. Likewise, in her declaration verifying the Motion, Plaintiff indicates that Defendants offered her 10 hours a day of services in the community if she would move into a nursing home. *See* Haddad Dec. at 3–4.

unable to provide these services to Plaintiff indefinitely. *See* Haddad Dec. at 4. Indeed, he intended to return to his responsibilities in Miami. *See id.*; Johns Dec. at 5. Upon such occurrence, absent other assistance, Plaintiff would be forced to leave the community and enter a nursing home in order to receive the care she requires. *See* Haddad Dec. at 4–5; Johns Dec. at 5.

Defendants are responsible for administering Florida's in-home services waiver programs, *see* Kidder Aff. at 1; Hudson Aff. at 1; Russell Aff. II at 1, including the Traumatic Brain Injury/Spinal Cord Injury Waiver ("TBI/SCI Waiver") program implemented in 1999, *see* Kidder Aff. at 2; Hudson Aff. at 1–3. Through this program, the state delivers in-home services, such as home health care and related services, to Medicaid eligible persons with traumatic brain or spinal cord injuries so that they can remain in the community. *See* Russell Aff. II at 1–2. The TBI/SCI Waiver program grew from a monthly caseload of 245 persons and yearly expenditures of $5,874,815 in fiscal year 2005 to 2006, to 309 persons and $10,066,381 in 2008 to 2009. *See* Hudson Aff. at 3. Defendants have various other waiver programs that deliver services to persons with other physical and mental disabilities. *See id.* at 1–3; Kidder Aff. at 2. These programs have increased in size and scope over the course of their existence. *See* Hudson Aff. at 1–3. In fiscal year 2008 to 2009, the average monthly caseload of Medicaid recipients in nursing homes was approximately 50,000, and the average monthly caseload in in-home services waiver programs was approximately 61,000. *See id.* at 4.

In November 2007, while Plaintiff was still at Brooks, she applied to receive services under Defendants' TBI/SCI Waiver. *See* Haddad Dec. at 2–3; *see also* Johns Dec. at 5. However, Plaintiff has not received any TBI/SCI Waiver services despite having been on the waiting list for approximately two-and-a-half years. *See* Haddad Dec. at 3–5. In a letter dated January 8, 2010, Defendants acknowledged that Plaintiff was on a waiting list to receive in-home services, but explained:

> [p]resently, the Department of Children and Families does not have funds available (or available openings) to serve additional individuals through these programs.... Placement on the waiting list does not ensure future eligibility. Funding is very limited in these programs, and the amount of funding allocated to these programs has not been increased in many years. Unfortunately, moving individuals off the waiting list into these programs does not occur frequently, therefore, we encourage you to continue seeking services from other programs.

January 8, 2010 Letter at 1.

Plaintiff's income is limited to her Social Security Disability Insurance, and she is eligible for, and receives, Medicare and Medicaid. *See id.* at 4. With her other sources of assistance withdrawing, Plaintiff faced the risk of institutionalization without in-home services through Defendants' TBI/SCI Waiver.[8] *See id.* at 5; Johns Dec. at 5. Accordingly, Plaintiff contacted

---

**8.** Plaintiff argues that an additional potential source of assistance is Defendants' personal care services waiver, but contends that this program is only available to individuals residing in nursing homes. *See* Motion at 5–6, 19 n. 5; Transcript of June 15, 2010 Hearing (Doc No. 47; Tr.) at 8. However, at the hearing, Defendants argued that there is no personal care services program. *See* Tr. at 33–35, 100–02. Instead, services of a personal

Defendants in early March 2010, to notify them of the change in her circumstances, and that she desperately required in-home services. *See* Haddad Dec. at 4. In late April 2010, Defendants informed Plaintiff that there were no funds for in-home services, but if she would move into a nursing home, after sixty days in the nursing home, she would be eligible to receive ten hours a day of in-home services through the Florida Nursing Home Transition Plan (the "Transition Plan"). *See id.*; Russell Aff. I at 2; Tr. at 109–15; *see also* Transition Plan at 1–12; Long Settlement at 1–13. However, Plaintiff does not wish to enter a nursing home; she wishes to receive the in-home services for which she is medically and financially eligible and to remain in the community, where she leads an active life. *See* Haddad Dec. at 3–4. Additionally, Plaintiff's physician opines that, even if she meets the criteria for nursing home care, Plaintiff will quickly become depressed and her health will most likely deteriorate if she is placed in a nursing home. *See* Johns Dec. at 5.

Plaintiff is eligible for the TBI/SCI Waiver, *see* Kidder Aff., at 3; Medicaid Eligibility at 1–2; Waiver Eligibility at 1–2; Fact Sheets at 4–5, and would benefit from the program, *see* Johns Dec. at 5, however, Defendants have represented that there are no funded slots available in the program at this time, *see* January 8, 2010 Letter at 1; Russell Aff. I at 2; Haddad Dec. at 4. Priority of placement on the TBI/SCI Waiver waiting list is based on the probability, given the individual's level of community support and severity of needs, that, but for the TBI/SCI Waiver, the non-institutionalized individual will be institutionalized or the institutionalized individual will not be deinstitutionalized. *See* Russell Aff. II at 2. At the Preliminary Injunction Hearing, defense counsel was unsure of Plaintiff's exact position on the waiting list, but represented to the Court that she was not in the top forty-five spots. *See* Tr. at 51–52. Defendants did not know the average wait time for individuals on the waiting list or the average turnover. *See id.* at 54, 57, 102–03. However, Defendants explained that, because movement on the waiting list is based on an individual's needs, rather than time spent on the waiting list, the wait time can vary greatly from person to person. *See id.* at 102–03. If a person's needs change, they can request reassessment which can change their position on the waiting list. *See id.* at 102–03, 115. Nevertheless, despite Plaintiff's contact with Defendants in March 2010, advising them of her change in circumstances, Plaintiff has not been reassessed since January 2010. *See id.* at 115–16.

Although Plaintiff has been on the waiting list for waiver services since at least early 2008, and Defendants have represented to Plaintiff that the TBI/SCI Waiver program is full, the data from 2008 to 2009 may conflict with this representation. The TBI/SCI Waiver has been approved for 375 persons for the period beginning July 1, 2007, through June 30, 2012. *See* Waiver Amendment at 1. According to the Waiver List, which summarizes information regarding the utilization and cost of

nature, such as those Plaintiff requires, which are rendered to individuals in nursing homes are incidental to the nursing home placement. *See id.* They are not the subject of an independent waiver or funding source. *See id.* Plaintiff focused her argument on the waiver program and provided little argument regarding her entitlement to in-home services based on the fact that such services would otherwise be incidental to institutionalization. As such, the Court's ruling addresses only Plaintiff's primary argument at this time.

the state's various waiver programs, as of November 1, 2008, the TBI/SCI Waiver had an enrollment of only 343 persons and a waiting list of 554 persons. *See* Waiver List at 2. Additionally, the Hudson Affidavit represents that, at the end of fiscal year 2008 to 2009, enrollment in the TBI/SCI Waiver was 309 persons. *See* Hudson Aff. at 3. Thus, it is unclear whether all 375 funded slots in the TBI/SCI Waiver Program are fully utilized.

Even if the program is full, Defendants readily acknowledge that they could expand the number of slots in the program before 2012, *see id.* at 59–60, but that would only guarantee money from the federal government. Defendants would still need to provide Florida's portion of the funding, as well as the expanded provider network necessary to support such an expansion, *see id.* at 65–66. However, Defendants provided no evidence as to the cost or impact of such an expansion on other programs or its ability to provide adequate services to the state's disabled population. Nevertheless, Defendants do assert that placing Plaintiff into the program would violate the TBI/SCI Waiver rules because Plaintiff is not next on the waiting list, and that if Defendants were forced to place Plaintiff in the TBI/SCI Waiver, they would have to reduce services that others in the program are currently receiving. *See* Russell Aff. I at 2; *see also* Tr. at 49–50, 66–67.

Nursing home care is a mandatory service under Medicaid, and if Plaintiff is required to enter a nursing facility, Defendants would have to pay for such care irrespective of budgetary constraints. *See* Tr. at 111. Defendants admit that, "[i]n most cases, when a Medicaid recipient is diverted or transitioned from a nursing facility to an [in-home services] waiver program, costs to Medicaid for providing care to that individual are reduced." Hudson Aff. at 3. Indeed, for budgeting purposes, Defendants assume a two-to-one savings for those diverted from nursing homes. *See id.* at 3–4. However, because of Defendants' budget structure, Defendants would require Plaintiff to enter a nursing home, where funding comes from the state's nursing home line item which the state is required to pay. *See* Tr. at 111. Then, after at least sixty consecutive days in a nursing facility, Plaintiff would be eligible for the in-home services she requires from the TBI/SCI Waiver through the Transition Plan. *See* Kidder Aff. at 2; Tr. at 110–14.

The Transition Plan is independently funded by the Florida legislature through the nursing home line item, *see* Kidder Aff. at 2; Tr. at 112, and was implemented to give Defendants a funding source to deinstitutionalize individuals who are qualified for in-home services but are languishing in nursing homes because of full waiver programs, *see* Tr. at 110–11. Essentially, the Transition Plan gives Defendants' budget flexibility. *See id.* at 111. The sixty-day requirement was implemented to avoid gamesmanship, such as individuals entering nursing facilities for a day and then jumping out immediately into a waiver program, *see id.* at 112–14, and Defendants contend that the requirement assures that an individual would legitimately, but for in-home services, enter a nursing home and be institutionalized, *see id.* at 104–06 ("Well, if somebody is going to spend 60 days in a nursing home, that makes it much more likely that they would have had to, without these waiver services, go into a nursing home. It's essentially an assessment of need."). Additionally, Defendants explain that the policy reflects Florida's focus on deinstitutionalization as a priority

over diversion. *See id.* at 106–07. Notably, however, Defendants do not assure that Plaintiff will be transitioned into the TBI/SCI Waiver immediately after sixty consecutive days in a nursing facility. *See id.* at 19, 73–75. Instead, Defendants state that Plaintiff would have to be institutionalized for "at least" sixty days, but then would have to be assessed and be determined to be safe for community placement. By this action, Plaintiff seeks injunctive relief requiring Defendants to provide her with in-home services without first subjecting herself to unnecessary institutionalization.

## III. *DEFENDANTS' "STANDING" CHALLENGE*

As an initial matter, Defendants assert that Plaintiff lacks standing to pursue this action because she has not been discriminated against "by reason of ... disability" and because any claims she has are precluded by a settlement reached in the case of *Dubois v. Levine,* Case No. 4:03–CV–107–SPM from the United States District Court for the Northern District of Florida. See Defendants' Motion to Dismiss Complaint (Doc. No. 32; Motion to Dismiss).[9] Although Defendants did not raise these arguments as a challenge to Plaintiff's standing to sue in response to the Motion, they did present them in their Motion to Dismiss and during the Preliminary Injunction Hearing. While Defendants suggest that their arguments present a challenge to Plaintiff's standing to pursue this action, that contention is simply without merit.

■■■ Standing is a jurisdictional requirement, and the party invoking federal jurisdiction has the burden of establishing it. *See Lujan v. Defenders of Wildlife,* 504 U.S. 555, 561, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). In order to establish standing under Article III of the United States Constitution, a plaintiff must "allege such a personal stake in the outcome of the controversy as to warrant [her] invocation of federal-court jurisdiction and to justify exercise of the court's remedial powers on [her] behalf." *Watts v. Boyd Properties,* 758 F.2d 1482, 1484 (11th Cir.1985) (quoting *Warth v. Seldin,* 422 U.S. 490, 499–500, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975)). Specifically, a plaintiff must prove three elements in order to establish standing: (1) that he or she has suffered an "injury-in-fact," (2) that there is a "causal connection between the asserted injury-in-fact and the challenged action of the defendant," and (3) that a favorable decision by the court will redress the injury. *See Shotz v. Cates,* 256 F.3d 1077, 1081 (11th Cir.2001) (internal citations omitted). "These requirements are the 'irreducible minimum' required by the Constitution for a plaintiff to proceed in federal court." *Id.* at 1081 (quoting *Northeastern Fla. Chapter of Associated Gen. Contractors of America v. City of Jacksonville,* 508 U.S. 656, 664, 113 S.Ct. 2297, 124 L.Ed.2d 586 (1993)) (internal citations omitted). Additionally, in an action for injunctive relief, a plaintiff has standing only if the plaintiff establishes "a real and immediate—as opposed to a merely conjectural or hypothetical—threat of *future* injury." *See Wooden v. Board of Regents of University System of Georgia,* 247 F.3d 1262, 1284 (11th Cir. 2001). A complaint that includes "only past incidents of discrimination" is insufficient to allege a real and immediate threat

---

**9.** Plaintiff has responded to the Motion to Dismiss. *See* Plaintiff Michele Haddad's Memorandum of Law in Opposition to Defendants' Motion to Dismiss Complaint (Doc. No. 35; Response to Motion to Dismiss).

of future injury. *See Shotz*, 256 F.3d at 1081.

■ Defendants do not attempt to contest that Plaintiff can satisfy each of these requirements. Instead, they appear to present a challenge to Plaintiff's ability to state a claim for relief under the ADA, as well as a potential defense—that Plaintiff's claims are barred by issue preclusion—or collateral estoppel. *See* Motion to Dismiss at 4; *see Cope v. Bankamerica Hous. Serv., Inc.*, No. Civ.A. 99–D–653–N, 2000 WL 1639590, at *4 (M.D.Ala. Oct. 10, 2000). Upon review of Plaintiff's claims, the Court is fully satisfied that she has alleged an injury in fact, which is purportedly caused by the Defendants' actions, and for which a favorable decision by the Court would provide redress. Moreover, Plaintiff alleges a real and immediate threat of future injury. Thus, the Court determines that Plaintiff has standing to pursue the claims raised in this action. Moreover, neither of the challenges raised by Defendants in their "standing" discussion is actually a challenge to the Court's subject matter jurisdiction. Thus, the Court will consider these arguments as challenges to Plaintiff's ability to succeed on the merits of her claims.

## IV. STANDARD FOR RELIEF

■ A party seeking preliminary injunctive relief must establish that "(1) it has a substantial likelihood of success on the merits, (2) the movant will suffer irreparable injury unless the injunction is issued, (3) the threatened injury to the movant outweighs the possible injury that the injunction may cause the opposing party,

and (4) if issued, the injunction would not disserve the public interest" before the district court may grant such relief. *Horton v. St. Augustine*, 272 F.3d 1318, 1326 (11th Cir.2001) (citing *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir.2000)); *see also Int'l Cosmetics Exch. v. Gapardis Health & Beauty, Inc.*, 303 F.3d 1242, 1246 (11th Cir.2002) (citing *Levi Strauss & Co. v. Sunrise Int'l Trading Inc.*, 51 F.3d 982, 985 (11th Cir.1995)). Additionally, "[i]t is well established in this circuit that a preliminary injunction is an extraordinary and drastic remedy not to be granted unless the movant clearly established the burden of persuasion as to all four elements." *Siegel*, 234 F.3d at 1176 (internal quotations and alterations omitted).

■ A typical preliminary injunction is prohibitive in nature and seeks simply to maintain the status quo pending a resolution of the merits of the case. *See Mercedes–Benz U.S. Int'l, Inc. v. Cobasys, LLC*, 605 F.Supp.2d 1189, 1196 (N.D.Ala. 2009). When a preliminary injunction is sought to force another party to act, rather than simply to maintain the status quo, it becomes a "mandatory or affirmative injunction" and the burden on the moving party increases. *Exhibitors Poster Exch. v. Nat'l Screen Serv. Corp.*, 441 F.2d 560, 561 (5th Cir.1971). Indeed, a mandatory injunction " 'should not be granted except in rare instances in which the facts and law are clearly in favor of the moving party.' " *Id.* (quoting *Miami Beach Fed. Sav. & Loan Ass'n v. Callander*, 256 F.2d 410, 415 (5th Cir.1958)); *see also Martinez v. Mathews*, 544 F.2d 1233, 1243 (5th Cir. 1976)[10] ("Mandatory preliminary relief, which goes well beyond simply maintaining

10. In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), the Eleventh Circuit adopted as binding precedent all the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

the status quo pendente lite, is particularly disfavored, and should not be issued unless the facts and law clearly favor the moving party."). Accordingly, a plaintiff seeking such relief bears a heightened burden of demonstrating entitlement to preliminary injunctive relief. *See Verizon Wireless Pers. Commc'n LP v. City of Jacksonville, Fla.,* 670 F.Supp.2d 1330, 1346 (M.D.Fla. 2009) (quoting the Southern District of New York, "Where a mandatory injunction is sought, 'courts apply a heightened standard of review; plaintiff must make a clear showing of entitlement to the relief sought or demonstrate that extreme or serious damage would result absent the relief.'"); *Mercedes–Benz,* 605 F.Supp.2d at 1196; *OM Group, Inc. v. Mooney,* No. 2:05–cv–546–FtM–33SPC, 2006 WL 68791, at *8–9 (M.D.Fla. Jan. 11, 2006).

Here, the parties disagree as to the nature of the relief sought. Plaintiff contends that because she merely seeks to prohibit unlawful discrimination, the injunctive relief she requests is prohibitive in nature and does not seek to change the status quo. However, Defendants argue that because Plaintiff is not currently receiving in-home health care services from Defendants, and requests that this Court order Defendants to provide her with such services, she seeks to change the status quo by requiring them to act. Because the Court determined that Plaintiff satisfied the heightened burden of demonstrating her entitlement to mandatory preliminary injunctive relief, the Court did not resolve the parties' dispute as to the applicable standard.

## V. DISCUSSION

### A. SUBSTANTIAL LIKELIHOOD OF SUCCESS ON THE MERITS

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."[11] 42 U.S.C. § 12132. In the decision of *Olmstead v. L.C. ex rel. Zimring,* 527 U.S. 581, 119 S.Ct. 2176, 144 L.Ed.2d 540 (1999), the Supreme Court considered the application of this anti-discrimination provision in a rather unique context:

> we confront the question whether the proscription of discrimination may require placement of persons with mental disabilities in community settings rather than in institutions.

*Id.* at 587, 119 S.Ct. 2176. The Court answered this question with a "qualified yes." *See id.* In doing so, the Court held that the unjustified institutional isolation of persons with disabilities is a form of discrimination by reason of disability. *See id.* at 597, 600–01, 119 S.Ct. 2176. The Court explained:

> Recognition that unjustified institutional isolation of persons with disabilities is a form of discrimination reflects two evident judgments. First, institutional placement of persons who can handle and benefit from community settings perpetuates unwarranted assumptions that persons so isolated are incapable or

---

**11.** Plaintiff's Rehab Act claim is essentially the same as her ADA claim, and discrimination claims of this kind are analyzed similarly under the two acts. *See Allmond v. Akal Sec., Inc.,* 558 F.3d 1312, 1316 n. 3 (11th Cir.2009) ("Because the same standards govern discrimination claims under the Rehabilitation Act and the ADA, we discuss those claims together and rely on cases construing those statutes interchangeably."). Accordingly, the Court will refer primarily to the ADA for the sake of brevity.

unworthy of participating in community life.... Second, confinement in an institution severely diminishes the everyday life activities of individuals, including family relations, social contacts, work options, economic independence, educational advancement, and cultural enrichment. Dissimilar treatment correspondingly exists in this key respect: In order to receive needed medical services, persons with mental disabilities must, because of those disabilities, relinquish participation in community life they could enjoy given reasonable accommodations, while persons without mental disabilities can receive the medical services they need without similar sacrifice.

*Id.* at 600–01, 119 S.Ct. 2176 (internal citations omitted). To avoid the discrimination inherent in the unjustified isolation of disabled persons, public entities are required to make reasonable modifications to policies, practices, and procedures for services they elect to provide. Nevertheless, the *Olmstead* Court recognized that a state's responsibility, once it determines to provide community-based treatment, is not without limits. *See id.* at 603, 119 S.Ct. 2176.[12] Rather, the regulations implementing the ADA require only "reasonable modifications" and permit a state to refuse alterations to programs that will result in a fundamental alteration of the program or service. *See id.*

In considering whether a proposed modification is a reasonable modification, which would be required, or a fundamental alter-

ation, which would not, the *Olmstead* Court determined that a simple comparison showing that a community placement costs less than an institutional placement is not sufficient to establish reasonableness because it overlooks other costs that the state may not be able to avoid. *See id.* at 604, 119 S.Ct. 2176. The Court explained,

Sensibly construed, the fundamental-alteration component of the reasonable-modifications regulation would allow the State to show that, in the allocation of available resources, immediate relief for the plaintiffs would be inequitable, given the responsibility the State has undertaken for the care and treatment of a large and diverse population of persons with mental disabilities.

*Id.* Indeed, the Court recognized that the fundamental alteration defense must be understood to allow some leeway to maintain a range of facilities and services. *See id.*

If, for example, the State were to demonstrate that it had a comprehensive, effectively working plan for placing qualified persons with mental disabilities in less restrictive settings, and a waiting list that moved at a reasonable pace not controlled by the State's endeavors to keep its institutions fully populated, the reasonable-modifications standard would be met.... In such circumstances, a court would have no warrant effectively to order displacement of persons at the top of the community-based treatment waiting list by individuals lower down who commenced civil actions.

12. " '[W]hile "[t]he section of Justice Ginsburg's opinion discussing the state's fundamental alteration defense commanded only four votes ... [b]ecause it relied on narrower grounds than did Justice Stevens' concurrence or Justice Kennedy's concurrence, both of which reached the same ultimate result, Justice Ginsburg's opinion controls." ' " *Arc of Washington State Inc. v. Braddock,* 427 F.3d 615, 617 (9th Cir.2005) (quoting *Sanchez v. Johnson,* 416 F.3d 1051, 1064 n. 7 (9th Cir.2005), quoting *Townsend v. Quasim,* 328 F.3d 511, 519 n. 3 (9th Cir.2003)).

*Id.* at 605–06, 119 S.Ct. 2176. Thus, having considered the ADA as well as the applicable regulations, the Court concluded that the ADA requires states to provide community based treatment for persons with disabilities when: (1) the state's treatment professionals have determined that community-based services are appropriate for an individual; (2) the individual does not oppose such services; and (3) the services can be reasonably accommodated, taking into account (a) the resources available to the state, and (b) the needs of others with disabilities. *See id.* at 602–04, 607, 119 S.Ct. 2176; *Pa. Prot. & Advocacy, Inc. v. Pa. Dep't of Pub. Welfare,* 402 F.3d 374, 379–80 (3d Cir.2005); *Frederick L. v. Dep't of Pub. Welfare of the Commonwealth of Pa.,* 364 F.3d 487, 493 (3d Cir. 2004); *Fisher v. Okla. Health Care Auth.,* 335 F.3d 1175, 1181 (10th Cir.2003). When these requirements are met, states must provide services to individuals in community settings rather than in institutions. *See Fisher,* 335 F.3d at 1181.

Before addressing the Court's conclusion that Plaintiff has established that she has a substantial likelihood of satisfying these requirements such that Defendants should be ordered, at this stage of the proceedings, to provide her with in-home services, the Court will first discuss Defendants' general challenges to Plaintiff's ability to pursue this action.

■ Defendants first argue that Plaintiff cannot state a claim of discrimination under the ADA because she is not being discriminated against "by reason of such disability" here because all in-home services waiver programs discriminate by their nature, providing services solely to disabled individuals and not to non-disabled individuals. *See* Response at 5–6; Motion to Dismiss at 4. However, the

Eleventh Circuit and the Supreme Court have squarely rejected this argument. *See Olmstead,* 527 U.S. at 597–601, 119 S.Ct. 2176 (affirming the finding of disability-based discrimination in *L.C. v. Olmstead,* 138 F.3d 893, 897–901 (11th Cir.1998)). The unjustified institutional isolation of persons with disabilities is a form of disability-based discrimination that need not be accompanied by dissimilar treatment of non-disabled persons. *See id.* Indeed, in rejecting this same argument by the state in *Olmstead,* the Court specifically stated, "Congress had a more comprehensive view of the concept of discrimination advanced in the ADA," *id.* at 598, 119 S.Ct. 2176, than the view espoused by the state. Therefore, Defendants' argument is not well taken.

Next, Defendants assert that Plaintiff's claims are barred by the doctrine of collateral estoppel. *See* Motion to Dismiss at 3–5. Specifically, Defendants explain that the issues underlying Plaintiff's claims were previously adjudicated by the settlement in the *Dubois* litigation, *see* Motion to Dismiss at 3–5, which resolved the claims of a class defined as encompassing "all individuals with traumatic brain or spinal cord injuries who the state has already determined or will determine to be eligible to receive services from Florida's Medicaid Waiver Program for persons with traumatic brain and spinal cord injuries and have not yet received such services," *see* Settlement (Doc. No. 32–2; Dubois Settlement) at 1.

■ The doctrine of collateral estoppel, also referred to as issue preclusion, bars the relitigation of issues that previously have been litigated and decided. *See Irvin v. United States,* 335 Fed.Appx. 821, 822–23 (11th Cir.2009); *Christo v. Padgett,* 223 F.3d 1324, 1339 (11th Cir.2000). To

apply collateral estoppel, the following elements must be present: "(1) the issue at stake is identical to the one involved in the prior proceeding; (2) the issue was actually litigated in the prior proceeding; (3) the determination of the issue in the prior litigation must have been 'a critical and necessary part' of the judgment in the first action; and (4) the party against whom collateral estoppel is asserted must have had a full and fair opportunity to litigate the issue in the prior proceeding." *See Christo*, 223 F.3d at 1339 (quoting *Pleming v. Universal–Rundle Corp.*, 142 F.3d 1354, 1359 (11th Cir.1998)). The principles of collateral estoppel are generally applicable to judgments entered in class actions like *Dubois*. *See Cope*, 2000 WL 1639590, at *5. However, while Defendants have provided the Court with a copy of the Dubois Settlement which was approved by the court, this single document is insufficient to establish that the first three prerequisites for collateral estoppel have been satisfied.[13] However, even if they are satisfied, a review of the Dubois Settlement establishes that Defendants cannot satisfy the fourth element. Thus, their collateral estoppel defense fails.

The Eleventh Circuit has found the "opportunity to litigate" element satisfied where a litigant was a party to the previous action, and was afforded a full and fair opportunity to address the issues in question. *See Irvin*, 335 Fed.Appx. at 823; *Christo*, 223 F.3d at 1340. However, where a particular claim has not accrued at the time of the earlier proceeding, litigants cannot be said to have had a full and fair opportunity to litigate the issues. *See In re Jennings*, 378 B.R. 687, 696 (M.D.Fla.2006) (full and fair opportunity to litigate requirement not satisfied where party had not yet been authorized to pursue a claim when the preceding adjudication occurred). Plaintiff was not a party to the *Dubois* litigation, nor was she a member of the class who would have had an opportunity to object to the settlement. This is so because Plaintiff did not suffer her injury until September 7, 2007, after the *Dubois* action was filed and even after the Dubois Settlement was signed and approved by the court. Accordingly, she had no opportunity to litigate her claims which had not yet accrued. *See In re Jennings*, 378 B.R. at 696.

---

**13.** Indeed, a cursory review of the Dubois Settlement raises significant questions about the Defendants' ability to satisfy the second and third elements. Paragraph H(2) of the Dubois Settlement agreement provides "all legal representations, including agreements based on legal claims, attributable to the Defendants as set out herein are solely and exclusively for the purpose of this settlement and shall not be binding on these Defendants or Plaintiffs in any other action or proceeding...." See Dubois Settlement at 11. Thus, it appears that the parties to the Dubois Settlement specifically intended that their agreement not have any prospective preclusive effect. Moreover, the Dubois Settlement affirmatively provides "this agreement is not an admission of any wrongdoing or misconduct on the part of Defendants nor is it an admission by Plaintiffs that Defendant would have prevailed in this litigation." See id. at 8. In Cope, the court found the

second element of collateral estoppel lacking where the settlement agreements at issue contained provisions indicating that the settlements did not constitute admissions of fault, liability or wrongdoing or an admission that the claims were valid. In doing so, the court noted that in accepting the prior settlement agreements, the reviewing court did not actually "determine" any issues bearing on the defendant's liability. See Cope, 2000 WL 1639590, at *9–10. Therefore, the common issues had not actually been litigated. See id. Here, the parties did not present argument regarding the satisfaction of these elements of collateral estoppel in any detail. Because the Court finds that the final element required for collateral estoppel is clearly lacking, it need not address these elements further.

Defendants' authorities in support of issue preclusion based on the Dubois Settlement are unavailing. In *Reyn's Pasta Bella, LLC v. Visa USA, Inc.*, class members who were parties to the judicial proceedings were precluded from collaterally attacking a settlement agreement where they were part of the class and represented by counsel at the fairness hearing on the settlement agreement. *See* 442 F.3d 741, 746–47 (9th Cir.2006). Similarly, in *Carter v. Rubin*, the court noted that "[c]ollateral estoppel, or issue preclusion, ... bars 'relitigation of [an] issue in a suit on a different cause of action involving a *party* to the first case.' " *See* 14 F.Supp.2d 22, 34 (D.D.C.1998) (second alteration in original underline supplied). Unlike these plaintiffs, Plaintiff Haddad was not a party to the *Dubois* litigation.

In an effort to overcome this deficiency, Defendants assert that a strict reading of the class certified in *Dubois* establishes that Plaintiff is bound by that adjudication because she falls within the class definition which included "all individuals with traumatic brain or spinal cord injuries who the state has already determined or will determine to be eligible to receive services from Florida's Medicaid Waiver Program ... and have not yet received such services." *See* Dubois Settlement at 1. However, Plaintiff could not have been a member of that class because, at the time the complaint was filed and the Dubois Settlement was signed and approved, she had no such injury. The language "who the state has already determined *or will determine* to be eligible to receive services" does not extend the class, *ad infinitum*, to all those for whom the state will ever make such a determination even though they had no injury at the time the Dubois Settlement was contemplated. Rather, this language plainly refers to those with such injuries *at*

*the time* of the action, whether or not the state had determined their eligibility for services. Accordingly, Plaintiff's claims in this action are not barred by the Dubois Settlement.

Defendants also contend that the motion for preliminary injunction must be denied because the implementing regulations of the ADA do not create a private right of action, and therefore, Plaintiff has no claim. Defendants cite *Am. Ass'n of People with Disabilities v. Harris*, 605 F.3d 1124 (11th Cir.2010) in support of this contention, but *Harris* is inapplicable to the present case. In *Harris*, the plaintiffs filed suit against various state actors for failure to provide handicapped-accessible voting machines. *See Harris*, 605 F.3d at 1126–27. The district court dismissed the plaintiffs' claims under the ADA, Rehab Act, and the Florida Constitution and statutes, but permitted them to amend their complaint. *See id.* at 1127–28. The plaintiffs then filed a two-count amended complaint, asserting claims under the ADA and the Rehab Act. *See id.* at 1128. After a bench trial, the district court issued a declaratory judgment and an injunction against the Supervisor of Elections ("Supervisor") based not on a finding that he or any defendant violated the ADA or the Rehab Act, but rather based on a conclusion that the Supervisor of Elections violated the ADA's implementing regulation, 28 C.F.R. § 35.151(5), which deals with nondiscrimination on the basis of disability in state and local services. *See id.* at 1128–29. The Supervisor appealed the injunction, but while that appeal was pending, other circumstances rendered it moot. *See id.* at 1130. The district court then entered final judgment against the Supervisor in accordance with the declaratory judgment and injunction, which the Supervisor appealed. *See id.* at 1130–31.

In vacating the district court's judgment, the Eleventh Circuit noted that, although the amended complaint contained claims under the ADA and the Rehab Act, the judgment did not declare that the defendants had violated either of those statutes. *See id.* at 1131. In fact, there was no finding at all in regard to the ADA or the Rehab Act. *See id.* The district court's judgment was, instead, limited to finding a violation of the ADA's implementing regulation. *See id.* The Eleventh Circuit opined that it was unclear where the district court had found the authority to order the Supervisor to comply with the implementing regulation without first determining whether the ADA, itself, authorized such relief. *See id.* Indeed, after performing such an analysis, the Eleventh Circuit held that there was no private right of action arising from the implementing regulation alone because congress placed available recourse within the ADA's express statutory right of action. *See id.* at 1132–35. Thus, absent a violation of the ADA, a violation of its implementing regulations would not create a private right of action and remedy. *See id.* at 1135–36.

Nevertheless, *Harris'* holding presents no bar to Plaintiff's claims because she is asserting a violation of the ADA, which does afford a private right of action. Indeed, *Harris* recognized that the ADA includes an express statutory right of action. *See id.* Moreover, the Supreme Court in *Olmstead* specifically found that unjustified isolation, under certain circumstances, can constitute a violation of the ADA. *See* 527 U.S. at 597, 119 S.Ct. 2176. This is the basis of Plaintiff's action—not a violation of the ADA's integration mandate, separate from the ADA or the Rehab Act, as in *Harris*. Therefore, *Harris* presents no bar to Plaintiff's assertion of her right

of action for a violation of the ADA based on unjustified isolation. *See id.* at 596–602, 119 S.Ct. 2176; *see also Crabtree v. Goetz*, NO. CIV.A. 3:08–0939, 2008 WL 5330506, at *24 (M.D.Tenn. Dec. 19, 2008); *Grooms v. Maram*, 563 F.Supp.2d 840, 851–854, 854 n. 3 (N.D.Ill.2008); *Radaszewski v. Maram*, No. 01 C 9551, 2008 WL 2097382, at *14 (N.D.Ill. Mar. 26, 2008). Defendants' arguments to the contrary simply reflect a mischaracterization of Plaintiff's claims. *See* Response at 5–6; Tr. at 36–38.

■ Alternatively, Defendants argue that Plaintiff cannot pursue her ADA claim because the Court must respect the plain language of the ADA regulations which instruct that a public entity need not provide personal care services. *See* Response at 6–10. Specifically, they rely on 28 C.F.R. § 35.135 which states that public entities are not required to provide "services of a personal nature including assistance in eating, toileting, or dressing." Defendants contend that in light of this regulation, the ADA cannot be interpreted to require them to provide such services to Plaintiff. *See id.* at 6. However, Defendants' argument misses the mark. The ADA does not require states to provide a level of care or specific services, but once states choose to provide certain services, they must do so in a nondiscriminatory fashion. *See Olmstead*, 527 U.S. 581, 603 n. 14, 119 S.Ct. 2176; *see also Fisher*, 335 F.3d at 1182 (state may not amend optional programs so as to violate the ADA); *cf. Rodriguez v. City of New York*, 197 F.3d 611, 619 (2d Cir.1999) (no ADA violation where plaintiffs requested service not already provided by defendant). Here, Defendants have elected to provide the services that Plaintiff requests through the TBI/SCI Waiver program. Having done

so, they must provide them in accordance with the ADA's anti-discrimination mandate. Therefore, if Plaintiff is entitled to Medicaid services and is otherwise qualified for, desires, and requires TBI/SCI Waiver services in order to avoid unnecessary institutionalization, the ADA may, indeed, require Defendants to provide Plaintiff with such services if doing so would not result in a fundamental alteration of its programs.

Defendants last broad challenge to the sufficiency of Plaintiff's claims is their argument that the ADA cannot abrogate or amend the Medicaid Act to make personal care services mandatory or to require Defendants to uncap their TBI/SCI Waiver program. *See* Response at 14–17. Specifically, Defendants contend that "the only way that Plaintiff's claims could be sustained is if the ADA were interpreted to amend (or partially repeal) the Medicaid Act by implication, by either amending/repealing 42 U.S.C. § 1396a(a)(10)(A), which makes personal care services optional for states" or by requiring states to provide services under waiver programs. Response at 14. Indeed, Defendants conclude, "if the ADA's prohibition of discrimination 'by reason of . . . disability' amends the Medicaid Act, then surely the HCBS waiver programs would not survive." Response at 17. This is so, they argue, because waiver programs by their nature discriminate based on disability. The Court concludes that Defendants' arguments are unavailing.

 First the Court rejects Defendants' contention that the success of Plaintiff's action requires a finding that the ADA invalidates or amends the Medicaid

Act by mandating the provision of personal care services which are otherwise an optional benefit. Plaintiff's claim requires no such finding. A determination that Plaintiff Haddad should be provided the services at issue to avoid imminent institutionalization does not require a finding that states are required to provide personal care services as a mandatory Medicaid benefit. Indeed, Plaintiff is not seeking an order requiring Defendants to provide particular services through a waiver program, nor does she contend that the ADA prohibits states from imposing any limit on such programs. Instead, she contends that because Defendants have chosen to provide personal care services through the TBI/SCI Waiver to persons such as herself, Defendants must administer its provision of those services in compliance with the ADA. A state that chooses to provide optional services, cannot defend against the discriminatory administration of those services simply because the state was not initially required to provide them. Indeed, Defendants have provided no authority for the proposition that a state that chooses to provide Medicaid services, even if otherwise optional, would not be required to comply with the ADA in the provision of those services, just as it would have to comply with the ADA for any other "services, programs, or activities" provided by a public entity.

The Court finds similarly unavailing Defendants' contention that Plaintiff's claim requires the Court to invalidate 42 U.S.C. § 1396n(c)(1), (9) and (10), which make waiver programs voluntary and permit states to cap the enrollment in such programs.[14] No such relief is sought in this action. Plaintiff's claim simply addresses

---

14. The Department of Health & Human Services, Center for Medicaid and State Opera-tions Olmstead Update No: 4 supports this determination:

the question of whether these Defendants, having opted to provide particular services via the mechanism of a Medicaid Waiver Program, may be required, under the ADA, to provide those same services to her if necessary to avoid imminent, unnecessary institutionalization. Defendants attempt to characterize such a finding as an invalidation of the Medicaid Act is without merit.

■ Having dispensed with Defendants' general challenges to Plaintiff's ability to pursue the instant cause of action, the Court turns its attention to the determination set forth in the June 23, 2010 Order that Plaintiff has clearly established that she has a substantial likelihood of prevailing on the merits of her claims. As previously noted, the *Olmstead* Court determined that the ADA requires states to provide community based treatment for persons with disabilities when: (1) the state's treatment professionals have determined that community-based services are appropriate for an individual; (2) the individual does not oppose such services; and (3) the services can be reasonably accommodated, taking into account (a) the resources available to the state and (b) the needs of others with disabilities. *See Olmstead,* 527 U.S. at 602–604, 607, 119 S.Ct. 2176.

It is undisputed that Defendants are public entities. Likewise, Defendants do not dispute that Plaintiff is a "qualified individual with a disability" who could be served in the community. Additionally, Plaintiff has provided ample evidence that she will have to enter an institution in order to receive the in-home services that would allow her to remain in the community and which Defendants provide through their TBI/SCI Waiver program. Indeed, Defendants have denied Plaintiff in-home services to date unless she first enters a nursing home so that funding for her services can be obtained from the Transition Plan. Thus, there is no dispute over the first two *Olmstead* factors. Plaintiff is on the waiting list as a qualified individual and Defendants admit she is medically eligible for institutional and waiver program care. Not only does Plaintiff not oppose receipt of in-home services, she describes herself as desperately seeking them. The only factor in question, then, is whether Plaintiff's requested accommodation, receipt of in-home services, is a reasonable accommodation in light of Defendants' resources and their obligations to other disabled individuals.

Defendants do not dispute that providing in-home services costs less than nursing home placement. As Plaintiff is qualified, and desires, to receive in-home services, and the provision of in-home

May a state establish a limit on the total number of people who may receive services under an [in-home services] waiver? Yes.... The State does not have an obligation *under Medicaid law* to serve more people in the [in-home services] waiver than the number requested by the State and approved by the Secretary. *If other laws (e.g., ADA) require the State to serve more people, the State may do so using non-Medicaid funds or may request an increase in the number of people permitted under the [in-*

*home services] waiver.* Whether the State chooses to avail itself of possible Federal funding is a matter of the State's discretion. *Failure to seek or secure Federal Medicaid funding does not generally relieve the State of an obligation that might be derived from other legislative sources (beyond Medicaid), such as the ADA.* http://www.cms.gov/smdl/downloads/smd 011001a.pdf ("Olmstead Update"); Reply at 9 (emphasis in original omitted; underline supplied).

services is cost-neutral,[15] the Court turns to the question of whether Plaintiff's requested accommodation would result in a fundamental alteration of Defendant's programs. *See Radaszewski v. Maram*, 383 F.3d 599, 614 (7th Cir.2004) (reversing judgment in defendant's favor and remanding for consideration of whether the requested relief "is unreasonable or would require a fundamental alteration of the State's programs and services for similarly situated disabled persons."); *Townsend v. Quasim*, 328 F.3d 511, 519–20 (9th Cir.2003) (reversing judgment and remanding for consideration of whether the modification requested would fundamentally alter the nature of services provided by the state); *see also Fisher*, 335 F.3d at 1180–81; *Messier v. Southbury Training Sch.*, 562 F.Supp.2d 294, 323 (D.Conn.2008).

■■ Defendants argue that Plaintiff's requested relief would constitute a fundamental alteration of its program because providing services to Plaintiff would cost more than Plaintiff's cost analysis indicates, as there are costs in the form of expanding its waiver program provider network which would be in addition to the added burden on their budget. Defendants also assert that they realize no savings unless an individual first enters a nursing home for a sufficiently long period of time. However, Defendant provided no *evidence* to support these arguments.[16] Beyond conclusory statements in the Response and at the hearing, Defendants have not shown how Plaintiff's cost analysis is flawed, how much an expansion of their provider network would cost, or why an individual must enter a nursing home facility for a certain period of time before Defendants realize any savings. While Defendants may be able to support these contentions on a more developed record, they have not done so here.

Additionally, the Court notes that if it costs less on a per day basis to provide in-home services instead of nursing facility care, it is unclear why Defendants would not realize some savings from the start. Defendants' contention appears to be based on the idea that if individuals are able to request and receive in-home services without first submitting to institutionalization, persons who are not truly at risk of institutionalization without state services, would nevertheless request provision of services at state expense. Thus, Defendants would be forced to spend funds for in-home services where no expenditure would otherwise be required. While this concern may have merit in the abstract, it has no application here. Based on the current record, Plaintiff has lost the provider of her necessary care. While her son stepped in to provide that care due to the exigent circumstances, his home and responsibilities in Miami, Florida will not permit him to continue to do so, and Plaintiff has no other source of care. While Defendants have suggested that they believe Plaintiff's actual risk of institutionalization is somewhat speculative, *see id.* at 62–63, the only evidence in the record supports a finding that Plaintiff is, indeed,

---

**15.** Indeed, in-home services are cost-saving rather than merely cost-neutral.

**16.** In the May 25 Order originally scheduling the Preliminary Injunction Hearing, the Court ordered the parties to submit all necessary evidence in advance of the hearing in accordance with Rule 4.06(b), Local Rules, United States District Court, Middle District of Florida (Local Rule(s)). Indeed, the hearing was continued in part to allow Defendants to obtain the necessary affidavits to present to the Court.

on the threshold of involuntary institutionalization, *see* Haddad Dec. at 4–5; Johns Dec. at 5. Thus, while Defendants may be able to present testimony or evidence clarifying and supporting their concern, they have not done so at this time, and the evidence before the Court strongly suggests that such a concern has no application as to this particular Plaintiff.[17]

Moreover, to the extent Defendants' refusal to provide services is based on its financial structure, the Court notes that budgetary constraints, taken alone, are not enough to establish a fundamental alteration defense. *See Pa. Prot. & Advocacy, Inc.*, 402 F.3d at 381. Factors relevant to a fundamental alteration defense certainly include the state's available resources, as well as its responsibility to other individuals. *See Olmstead*, 527 U.S. at 604, 119 S.Ct. 2176; *Pa. Prot. & Advocacy, Inc.*, 402 F.3d at 380. However, Defendants have pointed to no evidence, save for the single statement in the Russell Affidavit I that "[i]f the TBI/SCI Waiver Program were forced by court order to place Ms. Haddad in the program, we would have to reduce services that others in the TBI/SCI Waiver Program are currently receiving." Russell Aff. I at 2. However, where as here, the evidence is in conflict as to whether the TBI/SCI Waiver is actually full, this assertion is insufficient to support a fundamental alteration affirmative defense. Moreover, Defendants have failed to address other funding alternatives or to explain how being required to provide services to Plaintiff will undermine their ability to provide proper care to the state's disabled population. Indeed, Defendants provided no evidence that providing services to Plaintiff would cause their programs to suffer or be inequitable given the state's responsibility to provide for the care and treatment of its diverse population of persons with disabilities. Such evidence would certainly have been relevant to Defendants' fundamental alteration defense.

Additionally, the Court finds that on the current limited record, Defendants have simply failed to show that they have a comprehensive, effectively working plan in place to address unnecessary institutionalization. *See id.* at 381–82 (finding a comprehensive effective plan to be a prerequisite to mounting a fundamental alteration defense). In discussing the fundamental alteration defense, the Court in *Olmstead* recognized that if a state "had a comprehensive, effectively working plan for placing qualified persons with [disabilities] in less restrictive settings, and a waiting list that moved at a reasonable pace, not controlled by the state's endeavors to keep its institutions fully populated, the reasonable-modifications standard would be met" and the Court would have no reason to interfere. *Olmstead*, 527 U.S. at 605–606, 119 S.Ct. 2176. Following this guidance, in *Arc of Washington State Inc. v. Braddock*, 427 F.3d 615, 621 (9th Cir.2005), the Ninth Circuit determined that the state of Washington's waiver program provided such an effective comprehensive plan such that the ADA required no modification. In doing so, the court noted that the waiver program was full, had a waiting list with turnover, all eligible individuals had an opportunity to participate in the program once space became available, slots had been increased when appropriate, expendi-

---

**17.** The Court expresses no opinion as to the merit of such a challenge by others, under different circumstances, or where the challenge to Defendants' program is mounted on a more global basis.

tures more than doubled despite significant cutbacks or minimal budget growth in the agencies, and the institutionalized population declined by 20%. *See id.* at 621.

The record before the Court contains no similar evidence. Defendants have only shown that the various waiver programs have increased in size and expenditures. *See* Hudson Aff. at 1–3; *see also Makin ex rel. Russell v. Haw.,* 114 F.Supp.2d 1017, 1035 (D.Haw.1999) (only showing an effort to decrease waiting list by increasing slots, without evidence of a plan, did not show that the state was complying with the ADA). However, this does not address the effectiveness of the TBI/SCI Waiver program. Indeed, Defendants were unable to provide the Court with even the most basic factual information in regard to the waiver program and its waiting list. Defendants did not know Plaintiff's place on the waiting list beyond the fact that she was not in the top forty-five. *See* Tr. at 51–52. Defendants provided no information as to the average time spent on the waiting list or the rate of turnover, *see id.* at 54, 102–03, although Plaintiff has been waiting for approximately two-and-a-half years. Defendants' evidence was in conflict as to whether the TBI/SCI Waiver program was full. *See id.* at 60–62; 96–98. While Defendants argued that they are committed to decreasing the institutionalized population, they did not present evidence that it has steadily declined.[18] Indeed, contrary to Defendants' assertion of a comprehensive effective plan, the evidence suggests that Defendants' plan may well be ineffective given that their last representation to Plaintiff advised:

> [p]resently, the Department of Children and Families does not have funds available (or available openings) to serve additional individuals through these programs.... Placement on the waiting list does not ensure future eligibility. *Funding is very limited* in these programs, and *the amount of funding allocated to these programs has not been increased in many years.* Unfortunately, *moving individuals off the waiting list into these programs does not occur frequently,* therefore, we encourage you to continue seeking services from other programs.

January 8, 2010 Letter at 1. Moreover, despite Plaintiff having informed Defendants of the change in her circumstances in March 2010, Plaintiff has not been reassessed in regard to her priority on the waiting list for the TBI/SCI Waiver. *See* Haddad Dec. at 4; Tr. at 115–16.

Instead of providing evidence that they have in place an efficient comprehensive plan to avoid institutionalization, Defendants offer the alternative that Plaintiff enter a nursing home for at least sixty days and then be transitioned out of the institution and provided in-home services thereafter. *See* Tr. at 73–75. This proposal simply gives Defendants an alternative funding source for provision of the services Plaintiff requires. Thus, to satisfy Defendants' budgetary structure, an individual must run the gauntlet of institutionalization for at least sixty days in order to receive in-home services. *See id.* 105–07. Defendants have, on the current record, failed to show that such a deprivation is necessary to effectively provide care and treatment for the diverse population of persons with disabilities. Rather than providing for a proper assessment of need which may obviate the need for individuals

---

18. Counsel made some representations regarding numbers based on "his understanding" but presented no evidence in support of that understanding.

to meet such a threshold, Defendants appear to be shifting the unnecessary burden of institutionalization onto Medicaid recipients. Accordingly, on the current record, Defendants' fundamental alteration defense is not sufficiently supported, and Plaintiff established that the law and facts at this stage clearly indicate she is likely to prevail on the merits of her case.

### B. IRREPARABLE INJURY

Defendants argue that Plaintiff is unlikely to suffer irreparable injury because she will only be institutionalized temporarily. However, Defendants candidly acknowledge that they cannot assure the length of time in question, or that it is truly finite. Indeed, Defendants admit that upon the expiration of the sixty-day period, Plaintiff, who has been living successfully in the community for the last two and a half years, would have to be assessed by the state and be found to be safe for community placement. Accordingly, all Defendants can guarantee is that Plaintiff will face *at least* sixty days of institutionalization. *See id.* at 19, 73–75. The requirement that Plaintiff first enter a nursing home in order to be transitioned out sometime thereafter presents Plaintiff with exactly the kind of uncertain, indefinite institutionalization that can constitute irreparable harm. *See Katie A. v. L.A. County,* 481 F.3d 1150, 1156–57 (9th Cir. 2007) (though it applied an erroneous legal interpretation of the Medicaid statute, district court found unnecessary institutionalization that would occur absent a preliminary injunction to be irreparable harm); *Long v. Benson,* 2008 WL 4571903, at *2 (N.D.Fla. Oct. 14, 2008) (if preliminary injunction was not issued, plaintiff would have to re-enter nursing facility, which would inflict irreparable injury); *McMillan v. McCrimon,* 807 F.Supp. 475, 479 (C.D.Ill.1992) ("possibility that the plaintiffs would be forced to enter nursing homes constitutes irreparable harm that cannot be prevented or fully rectified by a judgment later"). Moreover, Plaintiff's physician has indicated that institutionalization will be detrimental to Plaintiff's health and well-being. *See* Johns Dec. at 5 ("if [Plaintiff] were placed in a nursing home she would quickly become depressed and her health would most likely deteriorate"); *see also Marlo M. v. Cansler,* 679 F.Supp.2d 635, 638 (E.D.N.C.2010) (plaintiffs would suffer regressive consequences); *Long,* 2008 WL 4571903, at *2 (plaintiff would suffer "enormous psychological blow"). Therefore, Plaintiff clearly established that she is at risk of irreparable injury if required to enter a nursing home.

### C. BALANCE OF HARMS

Additionally, Defendants admit that "if [Plaintiff] were to go into a nursing home tomorrow, okay, or today or next week or whatever, then clearly the balance of hardships would tip in her favor.... Hypothetically, that if she were to enter a nursing home, then yes, the balance of hardships would tip in her favor." Tr. at 65. But Defendants argue that Plaintiff's entry into a nursing home is speculative, and therefore, if Plaintiff would not be institutionalized for months or a year, the balance of harm would swing in Defendants' favor. *See id.* However, as previously noted, the Court is satisfied that Plaintiff established that she is, indeed, on the threshold of unnecessary institutionalization. *See* Haddad Dec. at 4–5; Johns Dec. at 5; Tr. at 83. Accordingly, the balance of harms clearly lies in Plaintiff's favor.

### D. THE PUBLIC INTEREST

Likewise, the public interest favors preventing the discrimination that faces Plain-

tiff so that she may avoid unnecessary institutionalization. *See Olmstead,* 527 U.S. at 599–601, 119 S.Ct. 2176. The public interest also favors "upholding the law and having the mandates of the ADA and Rehabilitation Act enforced," as well as in providing injunctive relief that "will cost less than the alternative care proposed by Defendants. As the funding originates from tax dollars, the public interest clearly lies with maintaining Plaintiffs in the setting that not only fulfills the important goals of the ADA, but does so by spending less for Plaintiffs' care and treatment." *See Marlo M.,* 679 F.Supp.2d at 638–39; *see also Long,* 2008 WL 4571903, at *3.

## V. CONCLUSION

In consideration of the foregoing, the Court determined that Plaintiff made a clear showing that she has a significant and substantial likelihood of succeeding on the merits of her claim, that Defendants' refusal to provide her with in-home based health care services for which she is financially and medically eligible, and which Defendants provide to others through the TBI/SCI Medicaid waiver program violates the ADA; that she will suffer irreparable injury unless the injunction is issued in that she is at imminent risk of being institutionalized in order to obtain the necessary services which Defendants refuse to provide her outside the institutional setting; that the threatened injury to Plaintiff outweighs the possible injury that the limited injunctive relief ordered here may cause Defendants; and that such an injunction would not disserve the public interest.[19] Accordingly, the Court entered its June 23, 2010 Order granting preliminary injunctive relief in this action.

19. Again, the Court cautions that its findings in this Opinion are strictly limited to the unique circumstances currently facing Plaintiff, Michele Haddad, and are based upon the limited record now before the Court. Thus, this Court's determination that preliminary injunctive relief is appropriate should not be interpreted as suggesting that the Court will find such relief warranted under circumstances different from those here, or that Defendants, on a more complete record, cannot establish that such relief would constitute a fundamental alteration of their programs or that they have a comprehensive, effectively working plan for providing services to qualified individuals with disabilities obviating the need for such relief.